## ZINERMON ET AL. *v.* BURCH

No. 87–1965.   Argued October 11, 1989—Decided February 27, 1990

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined, *post*, p. 139.

*Louis F. Hubener*, Assistant Attorney General of Florida, argued the cause for petitioners. With him on the briefs was *Robert A. Butterworth*, Attorney General.

*Richard M. Powers* argued the cause and filed a brief for respondent.*

JUSTICE BLACKMUN delivered the opinion of the Court.

## I

Respondent Darrell Burch brought this suit under 42 U. S. C. § 1983 (1982 ed.)[1] against the 11 petitioners, who are physicians, administrators, and staff members at Florida State Hospital (FSH) in Chattahoochee, and others. Re-

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Leon Friedman* and *Steven R. Shapiro;* and for the American Orthopsychiatric Association et al. by *John Townsend Rich, James E. Kaplan, Ruth L. Henning*, and *Leonard S. Rubenstein.*

[1] Section 1983 reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . ."

spondent alleges that petitioners deprived him of his liberty, without due process of law, by admitting him to FSH as a "voluntary" mental patient when he was incompetent to give informed consent to his admission. Burch contends that in his case petitioners should have afforded him procedural safeguards required by the Constitution before involuntary commitment of a mentally ill person, and that petitioners' failure to do so violated his due process rights.

Petitioners argue that Burch's complaint failed to state a claim under § 1983 because, in their view, it alleged only a random, unauthorized violation of the Florida statutes governing admission of mental patients. Their argument rests on *Parratt* v. *Taylor,* 451 U. S. 527 (1981) (overruled in part not relevant here, by *Daniels* v. *Williams,* 474 U. S. 327, 330–331 (1986)), and *Hudson* v. *Palmer,* 468 U. S. 517 (1984), where this Court held that a deprivation of a constitutionally protected property interest caused by a state employee's random, unauthorized conduct does not give rise to a § 1983 procedural due process claim, unless the State fails to provide an adequate postdeprivation remedy. The Court in those two cases reasoned that in a situation where the State cannot predict and guard in advance against a deprivation, a postdeprivation tort remedy is all the process the State can be expected to provide, and is constitutionally sufficient.

In the District Court, petitioners did not file an answer to Burch's complaint. They moved, instead, for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court granted that motion, pointing out that Burch did not contend that Florida's statutory procedure for mental health placement was inadequate to ensure due process, but only that petitioners failed to follow the state procedure. Since the State could not have anticipated or prevented this unauthorized deprivation of Burch's liberty, the District Court reasoned, there was no feasible predeprivation remedy, and, under *Parratt* and *Hudson,* the State's postdeprivation tort remedies provided Burch with all the process that was due him.

On appeal, an Eleventh Circuit panel affirmed the dismissal; it, too, relied on *Parratt* and *Hudson*. *Burch* v. *Apalachee Community Mental Health Services, Inc.*, 804 F. 2d 1549 (1986). The Court of Appeals, however, upon its own motion, ordered rehearing en banc. 812 F. 2d 1339 (1987). On that rehearing, the Eleventh Circuit reversed the District Court and remanded the case. 840 F. 2d 797 (1988). Since Burch did not challenge the constitutional adequacy of Florida's statutory procedure, the court assumed that that procedure constituted the process he was due. *Id.*, at 801, n. 8. A plurality concluded that *Parratt* did not apply because the State could have provided predeprivation remedies. 840 F. 2d, at 801–802. The State had given petitioners the authority to deprive Burch of his liberty, by letting them determine whether he had given informed consent to admission. Petitioners, in the plurality's view, were acting as the State, and since they were in a position to give Burch a hearing, and failed to do so, the State itself was in a position to provide predeprivation process, and failed to do so. Five judges dissented on the ground that the case was controlled by *Parratt* and *Hudson*. 840 F. 2d, at 810–814.

This Court granted certiorari to resolve the conflict—so evident in the divided views of the judges of the Eleventh Circuit—that has arisen in the Courts of Appeals over the proper scope of the *Parratt* rule.[2] 489 U. S. 1064 (1989).

---

[2] Several Courts of Appeals have found *Parratt* inapplicable where the defendant state officials had the state-clothed authority to effect a deprivation and had the power to provide the plaintiff with a hearing before they did so. See, *e. g.*, *Watts* v. *Burkhart*, 854 F. 2d 839, 843 (CA6 1988); *Wilson* v. *Clayton*, 839 F. 2d 375, 382 (CA7 1988); *Fetner* v. *Roanoke*, 813 F. 2d 1183, 1185–1186 (CA11 1987); *Freeman* v. *Blair*, 793 F. 2d 166, 177 (CA8 1986); *Patterson* v. *Coughlin*, 761 F. 2d 886, 891–893 (CA2 1985), cert. denied, 474 U. S. 1100 (1986); *Bretz* v. *Kelman*, 773 F. 2d 1026, 1031 (CA9 1985) (en banc); *Wolfenbarger* v. *Williams*, 774 F. 2d 358, 363–365 (CA10 1985).

Other Courts of Appeals have held that *Parratt* applies even to deprivations effected by the very state officials charged with providing predeprivation process. See, *e. g.*, *Vinson* v. *Campbell County Fiscal Court*, 820

Because this case concerns the propriety of a Rule 12(b)(6) dismissal, the question before us is a narrow one. We decide only whether the *Parratt* rule necessarily means that Burch's complaint fails to allege any deprivation of due process, because he was constitutionally entitled to nothing more than what he received—an opportunity to sue petitioners in tort for his allegedly unlawful confinement. The broader questions of what procedural safeguards the Due Process Clause requires in the context of an admission to a mental hospital, and whether Florida's statutes meet these constitutional requirements, are not presented in this case. Burch did not frame his action as a challenge to the constitutional adequacy of Florida's mental health statutes. Both before the Eleventh Circuit and in his brief here, he disavowed any challenge to the statutes themselves and restricted his claim to the contention that petitioners' failure to provide constitutionally adequate safeguards in his case violated his due process rights.[3]

F. 2d 194, 199 (CA6 1987); *Holloway* v. *Walker*, 784 F. 2d 1287, 1292–1293 (CA5 1986); *Yates* v. *Jamison*, 782 F. 2d 1182, 1185 (CA4 1986); *Wadhams* v. *Procunier*, 772 F. 2d 75, 77–78 (CA4 1985); *Toney-El* v. *Franzen*, 777 F. 2d 1224, 1227–1228 (CA7 1985); *Collins* v. *King*, 743 F. 2d 248, 254 (CA5 1984).

In addition, the Courts of Appeals are divided on the question whether *Parratt* applies to deprivations of liberty as well as deprivations of property rights. Compare *McRorie* v. *Shimoda*, 795 F. 2d 780, 786 (CA9 1986), and *Conway* v. *Mount Kisco*, 758 F. 2d 46, 48 (CA2 1985), with *Wilson* v. *Beebe*, 770 F. 2d 578, 584 (CA6 1985) (en banc), *Toney-El* v. *Franzen*, 777 F. 2d, at 1227, and *Thibodeaux* v. *Bordelon*, 740 F. 2d 329, 337–339 (CA5 1984).

[3] See Brief for Respondent 6 ("Burch is not attacking the facial validity of Florida's voluntary admission procedures any more than he is attacking the facial validity of Florida's involuntary admission procedures").

Inasmuch as Burch does not claim that he was deprived of due process by an established state procedure, our decision in *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422 (1982), is not controlling. In that case, the plaintiff challenged not a state official's error in implementing state law, but "the 'established state procedure' that destroys his entitlement without according him proper procedural safeguards." *Id.*, at 436.

Burch apparently concedes that, if Florida's statutes were strictly complied with, no deprivation of liberty without due process would occur. If

## II

### A

For purposes of review of a Rule 12(b)(6) dismissal, the factual allegations of Burch's complaint are taken as true. Burch's complaint, and the medical records and forms attached to it as exhibits, provide the following factual background:

On December 7, 1981, Burch was found wandering along a Florida highway, appearing to be hurt and disoriented. He was taken to Apalachee Community Mental Health Services (ACMHS) in Tallahassee.[4] ACMHS is a private mental health care facility designated by the State to receive patients suffering from mental illness.[5] Its staff in their evaluation forms stated that, upon his arrival at ACMHS, Burch was hallucinating, confused, and psychotic and believed he was "in heaven." Exhibit B–1 to Complaint. His face and chest were bruised and bloodied, suggesting that he had fallen or had been attacked. Burch was asked to sign forms giving his consent to admission and treatment. He did so. He remained at ACMHS for three days, during which time the facility's staff diagnosed his condition as paranoid schizophrenia and gave him psychotropic medication. On December 10, the staff found that Burch was "in need of longer-term stabilization," Exhibit B–2 to Complaint, and referred him to FSH, a public hospital owned and operated by the State as a mental health treatment facility.[6] Later that day, Burch

only those patients who are competent to consent to admission are allowed to sign themselves in as "voluntary" patients, then they would not be deprived of any liberty interest at all. And if all other patients—those who are incompetent and those who are unwilling to consent to admission—are afforded the protections of Florida's involuntary placement procedures, they would be deprived of their liberty only after due process.

[4] ACHMS was a named defendant in this case, but did not petition for certiorari.

[5] Under Fla. Stat. § 394.461(1) (1981), the State Department of Health and Rehabilitative Services may "designate any community facility as a receiving facility for emergency, short-term treatment and evaluation."

[6] See §§ 394.457(8) and 394.455(8).

signed forms requesting admission and authorizing treatment at FSH.  Exhibits C–1 and C–2 to Complaint.  He was then taken to FSH by a county sheriff.

Upon his arrival at FSH, Burch signed other forms for voluntary admission and treatment.  One form, entitled "Request for Voluntary Admission," recited that the patient requests admission for "observation, diagnosis, care and treatment of [my] mental condition," and that the patient, if admitted, agrees "to accept such treatment as may be prescribed by members of the medical and psychiatric staff in accordance with the provisions of expressed and informed consent."  Exhibit E–1 to Complaint.  Two of the petitioners, Janet V. Potter and Marjorie R. Parker, signed this form as witnesses.  Potter is an accredited records technician; Parker's job title does not appear on the form.

On December 23, Burch signed a form entitled "Authorization for Treatment."  This form stated that he authorized "the professional staff of [FSH] to administer treatment, except electroconvulsive treatment"; that he had been informed of "the purpose of treatment; common side effects thereof; alternative treatment modalities; approximate length of care"; and of his power to revoke consent to treatment; and that he had read and fully understood the Authorization.  Exhibit E–5 to Complaint.  Petitioner Zinermon, a staff physician at FSH, signed the form as the witness.

On December 10, Doctor Zinermon wrote a "progress note" indicating that Burch was "refusing to cooperate," would not answer questions, "appears distressed and confused," and "related that medication has been helpful."  Exhibit F–8 to Complaint.  A nursing assessment form dated December 11 stated that Burch was confused and unable to state the reason for his hospitalization and still believed that "[t]his is heaven."  Exhibits F–3 and F–4 to Complaint.  Petitioner Zinermon on December 29 made a further report on Burch's condition, stating that, on admission, Burch had been "disoriented, semi-

mute, confused and bizarre in appearance and thought," "not cooperative to the initial interview," and "extremely psychotic, appeared to be paranoid and hallucinating." The doctor's report also stated that Burch remained disoriented, delusional, and psychotic. Exhibit F–5 to Complaint.

Burch remained at FSH until May 7, 1982, five months after his initial admission to ACMHS. During that time, no hearing was held regarding his hospitalization and treatment.

After his release, Burch complained that he had been admitted inappropriately to FHS and did not remember signing a voluntary admission form. His complaint reached the Florida Human Rights Advocacy Committee of the State's Department of Health and Rehabilitation Services (Committee).[7] The Committee investigated and replied to Burch by letter dated April 4, 1984. The letter stated that Burch in fact had signed a voluntary admission form, but that there was "documentation that you were heavily medicated and disoriented on admission and . . . you were probably not competent to be signing legal documents." Exhibit G to Complaint. The letter also stated that, at a meeting of the Committee with FSH staff on August 4, 1983, "hospital administration was made aware that they were very likely asking medicated clients to make decisions at a time when they were not mentally competent." *Ibid.*

In February 1985, Burch filed a complaint in the United States District Court for the Northern District of Florida. He alleged, among other things, that ACMHS and the 11 individual petitioners, acting under color of Florida law, and "by and through the authority of their respective positions as employees at FSH . . . as part of their regular and official employment at FSH, took part in admitting Plaintiff to FSH

---

[7] See § 20.19(6)(b)2 (creating statewide Human Rights Advocacy Committee of eight citizens, charged with "[r]eceiving, investigating, and resolving reports of abuse or deprivation of constitutional and human rights" concerning health care).

as a 'voluntary' patient." App. to Pet. for Cert. 200.[8] Specifically, he alleged:

"Defendants, and each of them, knew or should have known that Plaintiff was incapable of voluntary, knowing, understanding and informed consent to admission and treatment at FSH. See Exhibit G attached hereto and incorporated herein.[9] Nonetheless, Defendants, and each of them, seized Plaintiff and against Plaintiff's will confined and imprisoned him and subjected him to involuntary commitment and treatment for the period from December 10, 1981, to May 7, 1982. For said period of 149 days, Plaintiff was without the benefit of counsel and no hearing of any sort was held at which he could have challenged his involuntary admission and treatment at FSH.

". . . Defendants, and each of them, deprived Plaintiff of his liberty without due process of law in contravention of the Fourteenth Amendment to the United States Constitution. Defendants acted with willful, wanton and reckless disregard of and indifference to Plaintiff's Constitutionally guaranteed right to due process of law." *Id.*, at 201–202.

---

[8] Burch further alleged that petitioners' "respective roles in the 'voluntary' admission process are evidenced by admissions-related documents" attached as exhibits to the complaint. App. to Pet. for Cert. 200. The documents referred to are the request-for-admission and authorization-of-treatment forms described above, and other related forms.

[9] Exhibit G is the April 4, 1984, letter to Burch from the Human Rights Advocacy Committee. Two specially concurring judges of the Eleventh Circuit expressed the view that this exhibit served as an allegation of a hospital custom and practice of eliciting consent to admission from incompetent patients. 840 F. 2d 797, 808 (1988). Since the plurality opinion did not rely on this reading of Burch's complaint, we express no view as to whether the complaint with attached exhibits sufficed to state a custom and practice claim.

## B

Burch's complaint thus alleges that he was admitted to and detained at FSH for five months under Florida's statutory provisions for "voluntary" admission. These provisions are part of a comprehensive statutory scheme under which a person may be admitted to a mental hospital in several different ways.[10]

First, Florida provides for short-term emergency admission. If there is reason to believe that a person is mentally ill and likely "to injure himself or others" or is in "need of care or treatment and lacks sufficient capacity to make a responsible application on his own behalf," he may immediately be detained for up to 48 hours. Fla. Stat. § 394.463(1)(a) (1981). A mental health professional, a law enforcement officer, or a judge may effect an emergency admission. After 48 hours, the patient is to be released unless he "voluntarily gives express and informed consent to evaluation or treatment," or a proceeding for court-ordered evaluation or involuntary placement is initiated. § 394.463(1)(d).

Second, under a court order a person may be detained at a mental health facility for up to five days for evaluation, if he is likely "to injure himself or others" or if he is in "need of care or treatment which, if not provided, may result in neglect or refusal to care for himself and . . . such neglect or refusal poses a real and present threat of substantial harm to his well-being." § 394.463(2)(a). Anyone may petition for a court-ordered evaluation of a person alleged to meet these criteria. After five days, the patient is to be released unless he gives "express and informed consent" to admission and treatment, or unless involuntary placement proceedings are initiated. § 394.463(2)(e).

Third, a person may be detained as an involuntary patient, if he meets the same criteria as for evaluation, and if the facil-

---

[10] We describe the statutory scheme as it existed in 1980–1981, when Burch was confined at FSH. The statutes have been amended since then in details not relevant for present purposes.

ity administrator and two mental health professionals recommend involuntary placement. §§ 394.467(1) and (2). Before involuntary placement, the patient has a right to notice, a judicial hearing, appointed counsel, access to medical records and personnel, and an independent expert examination. § 394.467(3). If the court determines that the patient meets the criteria for involuntary placement, it then decides whether the patient is competent to consent to treatment. If not, the court appoints a guardian advocate to make treatment decisions. § 394.467(3)(a). After six months, the facility must either release the patient, or seek a court order for continued placement by stating the reasons therefor, summarizing the patient's treatment to that point, and submitting a plan for future treatment. §§ 394.467(3) and (4).

Finally, a person may be admitted as a voluntary patient. Mental hospitals may admit for treatment any adult "making application by express and informed consent," if he is "found to show evidence of mental illness and to be suitable for treatment." § 394.465(1)(a). "Express and informed consent" is defined as "consent voluntarily given in writing after sufficient explanation and disclosure . . . to enable the person . . . to make a knowing and willful decision without any element of force, fraud, deceit, duress, or other form of constraint or coercion." § 394.455(22). A voluntary patient may request discharge at any time. If he does, the facility administrator must either release him within three days or initiate the involuntary placement process. § 394.465(2)(a). At the time of his admission and each six months thereafter, a voluntary patient and his legal guardian or representatives must be notified in writing of the right to apply for a discharge. § 394.465(3).

Burch, in apparent compliance with § 394.465(1), was admitted by signing forms applying for voluntary admission. He alleges, however, that petitioners violated this statute in admitting him as a voluntary patient, because they knew or should have known that he was incapable of making an in-

formed decision as to his admission. He claims that he was entitled to receive the procedural safeguards provided by Florida's involuntary placement procedure, and that petitioners violated his due process rights by failing to initiate this procedure. The question presented is whether these allegations suffice to state a claim under § 1983, in light of *Parratt* and *Hudson*.

## III

### A

To understand the background against which this question arises, we return to the interpretation of § 1983 articulated in *Monroe* v. *Pape*, 365 U. S. 167 (1961) (overruled in part not relevant here, by *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 664–689 (1978)). In *Monroe*, this Court rejected the view that § 1983 applies only to violations of constitutional rights that are authorized by state law, and does not reach abuses of state authority that are forbidden by the State's statutes or Constitution or are torts under the State's common law. It explained that § 1983 was intended not only to "override" discriminatory or otherwise unconstitutional state laws, and to provide a remedy for violations of civil rights "where state law was inadequate," but also to provide a federal remedy "where the state remedy, though adequate in theory, was not available in practice." 365 U. S., at 173–174. The Court said:

> "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Id.*, at 183.

Thus, overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983. A plaintiff, for example, may bring a § 1983 action for an unlawful search and seizure despite the fact that the search and seizure violated the State's Constitution or statutes, and

despite the fact that there are common-law remedies for trespass and conversion. As was noted in *Monroe,* in many cases there is "no quarrel with the state laws on the books," *id.,* at 176; instead, the problem is the way those laws are or are not implemented by state officials.

This general rule applies in a straightforward way to two of the three kinds of § 1983 claims that may be brought against the State under the Due Process Clause of the Fourteenth Amendment. First, the Clause incorporates many of the specific protections defined in the Bill of Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, *e. g.,* freedom of speech or freedom from unreasonable searches and seizures. Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Daniels* v. *Williams,* 474 U. S., at 331. As to these two types of claims, the constitutional violation actionable under § 1983 is complete when the wrongful action is taken. *Id.,* at 338 (STEVENS, J., concurring in judgments). A plaintiff, under *Monroe* v. *Pape,* may invoke § 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights.

The Due Process Clause also encompasses a third type of protection, a guarantee of fair procedure. A § 1983 action may be brought for a violation of procedural due process, but here the existence of state remedies *is* relevant in a special sense. In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law. Parratt,* 451 U. S., at 537; *Carey* v. *Piphus,* 435 U. S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, lib-

erty, or property").[11]  The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.  Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.  This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

In this case, Burch does not claim that his confinement at FSH violated any of the specific guarantees of the Bill of Rights.[12]  Burch's complaint could be read to include a substantive due process claim, but that issue was not raised in the petition for certiorari, and we express no view on whether the facts Burch alleges could give rise to such a claim.[13]  The

---

[11] The Court in *Carey* v. *Piphus* explained that a deprivation of procedural due process is actionable under § 1983 without regard to whether the same deprivation would have taken place even in the presence of proper procedural safeguards.  435 U. S., at 266 (even if the deprivation was in fact justified, so the plaintiffs did not suffer any "other actual injury" caused by the lack of due process, "the fact remains that they were deprived of their right to procedural due process").  It went on to say, however, that in cases where the deprivation would have occurred anyway, and the lack of due process did not itself cause any injury (such as emotional distress), the plaintiff may recover only nominal damages.  *Id.*, at 264, 266.

[12] One concurring judge of the Eleventh Circuit expressed the view that Burch's complaint stated a claim for an unreasonable seizure in violation of Fourth Amendment protections.  840 F. 2d, at 807–808.  Burch has not pursued this theory, however, and we do not address it.

[13] Five specially concurring judges of the Eleventh Circuit found Burch's complaint sufficient to state a substantive due process claim.  *Id.*, at 803–804.  The remainder of the en banc court either did not reach the issue, *id.*, at 807 (Clark, J., concurring), or took the view that Burch did not state such a claim, and that even if he had, the admission and treatment of a mentally ill person apparently willing to be admitted are not the sort of inherently wrongful and arbitrary state action that would constitute a sub-

claim at issue falls within the third, or procedural, category of § 1983 claims based on the Due Process Clause.

B

Due process, as this Court often has said, is a flexible concept that varies with the particular situation. To determine what procedural protections the Constitution requires in a particular case, we weigh several factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976).

Applying this test, the Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property. See, *e. g.*, *Cleveland Board of Education* v. *Loudermill*, 470 U. S. 532, 542 (1985) ("'[T]he root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest'"; hearing required before termination of employment (emphasis in original)); *Parham* v. *J. R.*, 442 U. S. 584, 606–607 (1979) (determination by neutral physician whether statutory admission standard is met required before confinement of child in mental hospital); *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U. S. 1, 18 (1978) (hearing required before cutting off utility service); *Goss* v. *Lopez*, 419 U. S. 565, 579 (1975) (at minimum, due process requires "*some* kind of notice and . . . *some* kind of hearing" (emphasis in original)); informal hearing required before suspension of students from

---

stantive due process violation. *Id.*, at 809 (Anderson, J., concurring specially); *id.*, at 815–817 (dissenting opinion for five judges).

public school); *Wolff* v. *McDonnell,* 418 U. S. 539, 557–558 (1974) (hearing required before forfeiture of prisoner's good-time credits); *Fuentes* v. *Shevin,* 407 U. S. 67, 80–84 (1972) (hearing required before issuance of writ allowing repossession of property); *Goldberg* v. *Kelly,* 397 U. S. 254, 264 (1970) (hearing required before termination of welfare benefits).

In some circumstances, however, the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process. See, *e. g., Logan* v. *Zimmerman Brush Co.,* 455 U. S. 422, 436 (1982) ("'[T]he necessity of quick action by the State or the impracticality of providing any predeprivation process'" may mean that a postdeprivation remedy is constitutionally adequate, quoting *Parratt,* 451 U. S., at 539); *Memphis Light,* 436 U. S., at 19 ("[W]here the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures . . . are sufficiently reliable to minimize the risk of erroneous determination," a prior hearing may not be required); *Ingraham* v. *Wright,* 430 U. S. 651, 682 (1977) (hearing not required before corporal punishment of junior high school students); *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600, 619–620 (1974) (hearing not required before issuance of writ to sequester debtor's property).

This is where the *Parratt* rule comes into play. *Parratt* and *Hudson* represent a special case of the general *Mathews* v. *Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide. In *Parratt,* a state prisoner brought a § 1983 action because prison employees negligently had lost materials he had ordered by mail.[14] The prisoner did not dispute that he had a postdeprivation remedy. Under state law, a tort-claim pro-

---

[14] *Parratt* was decided before this Court ruled, in *Daniels* v. *Williams,* 474 U. S. 327, 336 (1986), that a negligent act by a state official does not give rise to § 1983 liability.

cedure was available by which he could have recovered the value of the materials. 451 U. S., at 543–544. This Court ruled that the tort remedy was all the process the prisoner was due, because any predeprivation procedural safeguards that the State did provide, or could have provided, would not address the risk of *this kind* of deprivation. The very nature of a negligent loss of property made it impossible for the State to predict such deprivations and provide predeprivation process. The Court explained:

> "The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Id.*, at 541.

Given these special circumstances, it was clear that the State, by making available a tort remedy that could adequately redress the loss, had given the prisoner the process he was due. Thus, *Parratt* is not an exception to the *Mathews* balancing test, but rather an application of that test to the unusual case in which one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue. Therefore, no matter how significant the private interest at stake and the risk of its erroneous deprivation, see *Mathews*, 424 U. S., at 335, the State cannot be required constitutionally to do the impossible by providing predeprivation process.

In *Hudson*, the Court extended this reasoning to an intentional deprivation of property. A prisoner alleged that, during a search of his prison cell, a guard deliberately and maliciously destroyed some of his property, including legal

papers. Again, there was a tort remedy by which the prisoner could have been compensated. 468 U. S., at 534–535. In *Hudson,* as in *Parratt,* the state official was not acting pursuant to any established state procedure, but, instead, was apparently pursuing a random, unauthorized personal vendetta against the prisoner. 468 U. S., at 521, n. 2, 532. The Court pointed out: "The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." *Id.,* at 533. Of course, the fact that the guard's conduct was intentional meant that he himself could "foresee" the wrongful deprivation and could prevent it simply by refraining from his misconduct. Nonetheless, the Court found that an individual state employee's ability to foresee the deprivation is "of no consequence," because the proper inquiry under *Parratt* is "whether the *state* is in a position to provide for predeprivation process." 468 U. S., at 534 (emphasis added).

## C

Petitioners argue that the dismissal under Rule 12(b)(6) was proper because, as in *Parratt* and *Hudson,* the State could not possibly have provided predeprivation process to prevent the kind of "random, unauthorized" wrongful deprivation of liberty Burch alleges, so the postdeprivation remedies provided by Florida's statutory and common law necessarily are all the process Burch was due.[15]

---

[15] Burch does not dispute that he had remedies under Florida law for unlawful confinement. Florida's mental health statutes provide that a patient confined unlawfully may sue for damages. § 394.459(13) ("Any person who violates or abuses any rights or privileges of patients" is liable for damages, subject to good-faith immunity but not immunity for negligence). Also, a mental patient detained at a mental health facility, or a person acting on his behalf, may seek a writ of habeas corpus to "question the cause and legality of such detention and request . . . release." § 394.459(10)(a). Finally, Florida recognizes the common-law tort of false imprisonment. *Johnson* v. *Weiner,* 155 Fla. 169, 19 So. 2d 699 (1944).

Before turning to that issue, however, we must address a threshold question raised by Burch. He argues that *Parratt* and *Hudson* cannot apply to his situation, because those cases are limited to deprivations of property, not liberty.[16]

Burch alleges that he was deprived of his liberty interest in avoiding confinement in a mental hospital without either informed consent[17] or the procedural safeguards of the involuntary placement process. Petitioners do not seriously dispute that there is a substantial liberty interest in avoiding confinement in a mental hospital. See *Vitek* v. *Jones*, 445 U. S. 480, 491–492 (1980) (commitment to mental hospital entails "'a massive curtailment of liberty,'" and requires due process protection); *Parham* v. *J. R.*, 442 U. S., at 600 (there is a "substantial liberty interest in not being confined unnecessarily for medical treatment"); *Addington* v. *Texas*, 441 U. S. 418, 425 (1979) ("[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"); *Jackson* v. *Indiana*, 406 U. S. 715, 738 (1972) (due process requires at least that the nature and duration of commitment to a mental hospital "bear some reasonable relation to the purpose" of the commitment). Burch's confinement at FSH for five months without a hearing or any other procedure to determine either that he validly had consented to admission, or that he met the statutory standard for involuntary placement, clearly infringes on this liberty interest.

Burch argues that postdeprivation tort remedies are *never* constitutionally adequate for a deprivation of liberty, as opposed to property, so the *Parratt* rule cannot apply to this

[16] Some Courts of Appeals have limited the application of *Parratt* and *Hudson* to deprivations of property. See n. 2, *supra*.

[17] Of course, if Burch had been competent to consent to his admission and treatment at FSH, there would have been no deprivation of his liberty at all. The State simply would have been providing Burch with the care and treatment he requested. Burch alleges, however, that he was not competent, so his apparent willingness to sign the admission forms was legally meaningless.

case. We, however, do not find support in precedent for a categorical distinction between a deprivation of liberty and one of property. See *Lynch* v. *Household Finance Corp.*, 405 U. S. 538, 552 (1972) ("[T]he dichotomy between personal liberties and property rights is a false one"); *Wolff*, 418 U. S., at 557–558 (a hearing is generally required before final deprivation of property interests, and "a person's liberty is equally protected"). In *Parratt* itself, the Court said, 451 U. S., at 542, that its analysis was "quite consistent with the approach taken" in *Ingraham* v. *Wright*, 430 U. S. 651 (1977), a liberty interest case.

It is true that *Parratt* and *Hudson* concerned deprivations of property. It is also true that Burch's interest in avoiding five months' confinement is of an order different from inmate Parratt's interest in mail-order materials valued at $23.50. But the reasoning of *Parratt* and *Hudson* emphasizes the State's inability to provide predeprivation process because of the random and unpredictable nature of the deprivation, not the fact that only property losses were at stake. In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking. See *Loudermill*, 470 U. S., at 542; *Memphis Light*, 436 U. S., at 18; *Fuentes*, 407 U. S., at 80–84; *Goldberg*, 397 U. S., at 264. Conversely, in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake, see *Ingraham*, 430 U. S., at 682, or where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process. Thus, the fact that a deprivation of liberty is involved in this case does not automatically preclude application of the *Parratt* rule.

To determine whether, as petitioners contend, the *Parratt* rule necessarily precludes § 1983 liability in this case, we must ask whether predeprivation procedural safeguards could address the risk of deprivations of the kind Burch al-

leges. To do this, we examine the risk involved. The risk is that some persons who come into Florida's mental health facilities will apparently be willing to sign forms authorizing admission and treatment, but will be incompetent to give the "express and informed consent" required for voluntary placement under § 394.465(1)(a). Indeed, the very nature of mental illness makes it foreseeable that a person needing mental health care will be unable to understand any proffered "explanation and disclosure of the subject matter" of the forms that person is asked to sign, and will be unable "to make a knowing and willful decision" whether to consent to admission.[18] § 394.455(22) (definition of informed consent). A person who is willing to sign forms but is incapable of making an informed decision is, by the same token, unlikely to benefit from the voluntary patient's statutory right to request discharge. See § 394.465(2)(a). Such a person thus is in danger of being confined indefinitely without benefit of the procedural safeguards of the involuntary placement process, a process specifically designed to protect persons incapable of looking after their own interests. See §§ 394.467(2) and (3) (providing for notice, judicial hearing, counsel, examination by independent expert, appointment of guardian advocate, etc.).

Persons who are mentally ill and incapable of giving informed consent to admission would not necessarily meet the statutory standard for involuntary placement, which requires either that they are likely to injure themselves or others, or that their neglect or refusal to care for themselves threatens their well-being. See § 394.467(1)(b). The involuntary placement process serves to guard against the confinement of

---

[18] The characteristics of mental illness thus create special problems regarding informed consent. Even if the State usually might be justified in taking at face value a person's request for admission to a hospital for medical treatment, it may not be justified in doing so, without further inquiry, as to a mentally ill person's request for admission and treatment at a mental hospital.

a person who, though mentally ill, is harmless and can live safely outside an institution. Confinement of such a person not only violates Florida law, but also is unconstitutional. *O'Connor* v. *Donaldson*, 422 U. S. 563, 575 (1975) (there is no constitutional basis for confining mentally ill persons involuntarily "if they are dangerous to no one and can live safely in freedom"). Thus, it is at least possible that if Burch had had an involuntary placement hearing, he would not have been found to meet the statutory standard for involuntary placement and would not have been confined at FSH. Moreover, even assuming that Burch would have met the statutory requirements for involuntary placement, he still could have been harmed by being deprived of other protections built into the involuntary placement procedure, such as the appointment of a guardian advocate to make treatment decisions and periodic judicial review of placement. §§ 394.467(3) and (4).[19]

The very risks created by the application of the informed-consent requirement to the special context of mental health care are borne out by the facts alleged in this case. It appears from the exhibits accompanying Burch's complaint that he was simply given admission forms to sign by clerical workers, and, after he signed, was considered a voluntary patient. Burch alleges that petitioners knew or should have known that he was incapable of informed consent. This allegation is supported, at least as to petitioner Zinermon, by the psychiatrist's admission notes, described above, on Burch's mental state. Thus, the way in which Burch allegedly was admitted to FSH certainly did not ensure compliance with the statutory standard for voluntary admission.

---

[19] Hence, Burch might be entitled to actual damages, beyond the nominal damages awardable for a procedural due process violation unaccompanied by any actual injury, see *Carey* v. *Piphus*, 435 U. S. 247, 266–267 (1978), if he can show either that if the proper procedure had been followed he would have remained at liberty and that he suffered harm by being confined, or that even if he would have been committed anyway under the involuntary placement procedure, the lack of this procedure harmed him in some way.

We now consider whether predeprivation safeguards would have any value in guarding against the kind of deprivation Burch allegedly suffered. Petitioners urge that here, as in *Parratt* and *Hudson*, such procedures could have no value at all, because the State cannot prevent its officials from making random and unauthorized errors in the admission process. We disagree.

The Florida statutes, of course, do not allow incompetent persons to be admitted as "voluntary" patients. But the statutes do not direct any member of the facility staff to determine whether a person is competent to give consent, nor to initiate the involuntary placement procedure for every incompetent patient. A patient who is willing to sign forms but incapable of informed consent certainly cannot be relied on to protest his "voluntary" admission and demand that the involuntary placement procedure be followed. The staff are the *only* persons in a position to take notice of any misuse of the voluntary admission process and to ensure that the proper procedure is followed.

Florida chose to delegate to petitioners a broad power to admit patients to FSH, *i. e.*, to effect what, in the absence of informed consent, is a substantial deprivation of liberty. Because petitioners had state authority to deprive persons of liberty, the Constitution imposed on them the State's concomitant duty to see that no deprivation occurs without adequate procedural protections.

It may be permissible constitutionally for a State to have a statutory scheme like Florida's, which gives state officials broad power and little guidance in admitting mental patients. But when those officials fail to provide constitutionally required procedural safeguards to a person whom they deprive of liberty, the state officials cannot then escape liability by invoking *Parratt* and *Hudson*. It is immaterial whether the due process violation Burch alleges is best described as arising from petitioners' failure to comply with state procedures for admitting involuntary patients, or from the absence of a

specific requirement that petitioners determine whether a patient is competent to consent to voluntary admission. Burch's suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws. Burch is not simply attempting to blame the State for misconduct by its employees. He seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue.

This case, therefore, is not controlled by *Parratt* and *Hudson*, for three basic reasons:

First, petitioners cannot claim that the deprivation of Burch's liberty was unpredictable. Under Florida's statutory scheme, only a person competent to give informed consent may be admitted as a voluntary patient. There is, however, no specified way of determining, before a patient is asked to sign admission forms, whether he is competent. It is hardly unforeseeable that a person requesting treatment for mental illness might be incapable of informed consent, and that state officials with the power to admit patients might take their apparent willingness to be admitted at face value and not initiate involuntary placement procedures. Any erroneous deprivation will occur, if at all, at a specific, predictable point in the admission process — when a patient is given admission forms to sign.

This situation differs from the State's predicament in *Parratt*. While it could anticipate that prison employees would occasionally lose property through negligence, it certainly "cannot predict precisely when the loss will occur." 451 U. S., at 541. Likewise, in *Hudson*, the State might be able to predict that guards occasionally will harass or persecute prisoners they dislike, but cannot "know when such deprivations will occur." 468 U. S., at 533.

Second, we cannot say that predeprivation process was impossible here. Florida already has an established procedure

for involuntary placement. The problem is only to ensure that this procedure is afforded to all patients who cannot be admitted voluntarily, both those who are unwilling and those who are unable to give consent.

In *Parratt*, the very nature of the deprivation made pre-deprivation process "impossible." 451 U. S., at 541. It would do no good for the State to have a rule telling its employees not to lose mail by mistake, and it "borders on the absurd to suggest that a State must provide a hearing to determine whether or not a corrections officer should engage in negligent conduct." *Daniels*, 474 U. S., at 342, n. 19 (STEVENS, J., concurring in judgments). In *Hudson*, the errant employee himself could anticipate the deprivation since he intended to effect it, but the State still was not in a position to provide predeprivation process, since it could not anticipate or control such random and unauthorized intentional conduct. 468 U. S., at 533–534. Again, a rule forbidding a prison guard to maliciously destroy a prisoner's property would not have done any good; it would be absurd to suggest that the State hold a hearing to determine whether a guard should engage in such conduct.

Here, in contrast, there is nothing absurd in suggesting that, had the State limited and guided petitioners' power to admit patients, the deprivation might have been averted. Burch's complaint alleges that petitioners "knew or should have known" that he was incompetent, and nonetheless admitted him as a voluntary patient in "willful, wanton, and reckless disregard" of his constitutional rights. App. to Pet. for Cert. 201–202. Understood in context, the allegation means only that petitioners disregarded their duty to ensure that the proper procedures were followed, not that they, like the prison guard in *Hudson*, were bent upon effecting the substantive deprivation and would have done so despite any and all predeprivation safeguards. Moreover, it would indeed be strange to allow state officials to escape § 1983 liability for failing to provide constitutionally required procedural

protections by assuming that those procedures would be futile because the same state officials would find a way to subvert them.

Third, petitioners cannot characterize their conduct as "unauthorized" in the sense the term is used in *Parratt* and *Hudson*. The State delegated to them the power and authority to effect the very deprivation complained of here, Burch's confinement in a mental hospital, and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement. In *Parratt* and *Hudson*, the state employees had no similar broad authority to deprive prisoners of their personal property, and no similar duty to initiate (for persons unable to protect their own interests) the procedural safeguards required before deprivations occur. The deprivation here is "unauthorized" only in the sense that it was not an act sanctioned by state law, but, instead, was a "depriv[ation] of constitutional rights . . . by an official's abuse of his position." *Monroe*, 365 U. S., at 172.[20]

We conclude that petitioners cannot escape § 1983 liability by characterizing their conduct as a "random, unauthorized" violation of Florida law which the State was not in a position to predict or avert, so that all the process Burch could possibly be due is a postdeprivation damages remedy. Burch, according to the allegations of his complaint, was deprived of a substantial liberty interest without either valid consent or an involuntary placement hearing, by the very state officials charged with the power to deprive mental patients of their liberty and the duty to implement procedural safeguards.

---

[20] Contrary to the dissent's view of *Parratt* and *Hudson*, those cases do not stand for the proposition that in every case where a deprivation is caused by an "unauthorized . . . departure from established practices," *post*, at 146, state officials can escape § 1983 liability simply because the State provides tort remedies. This reading of *Parratt* and *Hudson* detaches those cases from their proper role as special applications of the settled principles expressed in *Monroe* and *Mathews*.

Such a deprivation is foreseeable, due to the nature of mental illness, and will occur, if at all, at a predictable point in the admission process. Unlike *Parratt* and *Hudson*, this case does not represent the special instance of the *Mathews* due process analysis where postdeprivation process is all that is due because no predeprivation safeguards would be of use in preventing the kind of deprivation alleged.

We express no view on the ultimate merits of Burch's claim; we hold only that his complaint was sufficient to state a claim under § 1983 for violation of his procedural due process rights.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

Without doubt, respondent Burch alleges a serious deprivation of liberty; yet equally clearly he alleges no violation of the Fourteenth Amendment. The Court concludes that an allegation of state actors' wanton, unauthorized departure from a State's established policies and procedures, working a deprivation of liberty, suffices to support a procedural due process claim even though the State provides adequate postdeprivation remedies for that deprivation. The Court's opinion unnecessarily transforms well-established procedural due process doctrine and departs from controlling precedent. I respectfully dissent.

*Parratt* v. *Taylor*, 451 U. S. 527 (1981), and *Hudson* v. *Palmer*, 468 U. S. 517 (1984), should govern this case. Only by disregarding the gist of Burch's complaint—that state actors' wanton and unauthorized departure from established practice worked the deprivation—and by transforming the allegations into a challenge to the adequacy of Florida's admissions procedures can the Court attempt to distinguish this case from *Parratt* and *Hudson*.

Burch alleges a deprivation occasioned by petitioners' contravention of Florida's established procedures. Florida allows the voluntary admission process to be employed to admit to its mental hospitals only patients who have made "application by express and informed consent for admission," and requires that the elaborate involuntary admission process be used to admit patients requiring treatment and incapable of giving such consent. See Fla. Stat. §§ 394.465, 394.467 (1981). Burch explicitly disavows any challenge to the adequacy of those established procedural safeguards accompanying Florida's two avenues of admission to mental hospitals. See Brief for Respondent 5 ("[T]he constitutional adequacy of Florida's voluntary admission and treatment procedures has never been an issue in this case since Burch was committed as an involuntary patient for purposes of this appeal"); id., at 6 ("Burch is not attacking the facial validity of Florida's voluntary admission procedures any more than he is attacking the facial validity of Florida's involuntary admission procedures"). Nor does the complaint allege any widespread practice of subverting the State's procedural safeguards. Burch instead claims that in his case petitioners wrongfully employed the voluntary admission process deliberately or recklessly to deny him the hearing that Florida requires state actors to provide, through the involuntary admission process, to one in his position. He claims that petitioners "knew or should have known" that he was incapable of consent but "with willful, wanton and reckless disregard of and indifference to" his constitutional rights "subjected him to involuntary commitment" without any hearing "at which he could have challenged his involuntary admission and treatment." App. to Pet. for Cert. 200–202 (complaint); see Brief for Respondent i, n. 1 ("The complaint alleges an intentional, involuntary commitment of Respondent by Petitioners . . ."). Consistent with his disavowal of any attack upon the adequacy of the State's established procedures, Burch alleges that petitioners flagrantly and at least recklessly contra-

vened those requirements. In short, Burch has alleged that petitioners' unauthorized actions worked the deprivation of his liberty.

*Parratt* and *Hudson* should readily govern procedural due process claims such as respondent's. Taken together, the decisions indicate that for deprivations worked by such random and unauthorized departures from otherwise unimpugned and established state procedures the State provides the process due by making available adequate postdeprivation remedies. In *Parratt*, the Court addressed a deprivation which "occurred as a result of the unauthorized failure of agents of the State to follow established state procedure." 451 U. S., at 543. The random nature of the state actor's unauthorized departure made it not "practicable for the State to provide a predeprivation hearing," *ibid.*, and adequate postdeprivation remedies available through the State's tort system provided the process due under the Fourteenth Amendment. *Hudson* applied this reasoning to intentional deprivations by state actors and confirmed the distinction between deprivation pursuant to "an established state procedure" and that pursuant to "random and unauthorized action." 468 U. S., at 532–533; cf. *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 435–436 (1982). In *Hudson*, the Court explained that the *Parratt* doctrine was applicable because "the *state* cannot possibly know in advance of a negligent deprivation of property," and that "[t]he controlling inquiry is solely whether the state is in a position to provide for predeprivation process." 468 U. S., at 534.

Application of *Parratt* and *Hudson* indicates that respondent has failed to state a claim allowing recovery under 42 U. S. C. § 1983 (1982 ed.). Petitioners' actions were unauthorized: they are alleged to have wrongly and without license departed from established state practices. Cf. *Hudson, supra*, at 532–533; *Parratt, supra*, at 543. Florida officials in a position to establish safeguards commanded that the voluntary admission process be employed only for consenting

patients and that the involuntary hearing procedures be used to admit unconsenting patients. Yet it is alleged that petitioners "with willful, wanton and reckless disregard of and indifference to" Burch's rights contravened both commands. As in *Parratt,* the deprivation "occurred as a result of the unauthorized failure of agents of the State to follow established state procedure." 451 U. S., at 543. The wanton or reckless nature of the failure indicates it to be random. The State could not foresee the particular contravention and was hardly "in a position to provide for predeprivation process," *Hudson, supra,* at 534, to ensure that officials bent upon subverting the State's requirements would in fact follow those procedures. For this wrongful deprivation resulting from an unauthorized departure from established state practice, Florida provides adequate postdeprivation remedies, as two courts below concluded, and which the Court and respondent do not dispute. *Parratt* and *Hudson* thus should govern this case and indicate that respondent has failed to allege a violation of the Fourteenth Amendment.

The allegedly wanton nature of the subversion of the state procedures underscores why the State cannot in any relevant sense anticipate and meaningfully guard against the random and unauthorized actions alleged in this case. The Court suggests that the State could foresee "that a person requesting treatment for mental illness might be incapable of informed consent." *Ante,* at 136. While foreseeability of that routine difficulty in evaluating prospective patients is relevant in considering the general adequacy of Florida's voluntary admission procedures, *Parratt* and *Hudson* address whether the State can foresee and thus be required to forestall the deliberate or reckless departure from established state practice. Florida may be able to predict that over time some state actors will subvert its clearly implicated requirements. Indeed, that is one reason that the State must implement an adequate remedial scheme. But Florida "cannot predict precisely when the loss will occur," *Parratt, supra,* at

541, and the Due Process Clause does not require the State to do more than establish appropriate remedies for any wrongful departure from its prescribed practices.

The Court attempts to avert the force of *Parratt* and *Hudson* by characterizing petitioners' alleged failures as only the routine but erroneous application of the admission process. According to the Court, Burch suffered an "erroneous deprivation," *ante,* at 136, and the "risk of deprivations of the kind Burch alleges" is that incompetent "persons who come into Florida's mental health facilities will apparently be willing to sign forms," *ante,* at 133, prompting officials to "mak[e] random and unauthorized errors in the admission process," *ante,* at 135. The Court's characterization omits petitioners' alleged wrongful state of mind and thus the nature and source of the wrongful deprivation.

A claim of negligence will not support a procedural due process claim, see *Daniels* v. *Williams,* 474 U. S. 327 (1986), and it is an unresolved issue whether an allegation of gross negligence or recklessness suffices, *id.,* at 334, n. 3. Respondent, if not the Court, avoids these pitfalls. According to Burch, petitioners "knew" him to be incompetent or were presented with such clear evidence of his incompetence that they should be charged with such knowledge. App. to Pet. for Cert. 201. Petitioners also knew that Florida law required them to provide an incompetent prospective patient with elaborate procedural safeguards. Far from alleging inadvertent or negligent disregard of duty, respondent alleges that petitioners "acted with willful, wanton and reckless disregard of and indifference" to his rights by treating him without providing the hearing that Florida requires. *Id.,* at 202. That is, petitioners did not bumble or commit "errors" by taking Burch's "apparent willingness to be admitted at face value." *Ante,* at 135, 136. Rather, they deliberately or recklessly subverted his rights and contravened state requirements.

The unauthorized and wrongful character of the departure from established state practice makes additional procedures

an "impracticable" means of preventing the deprivation. "The underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson*, 468 U. S., at 533; see *Parratt*, *supra*, at 541. The Court suggests that additional safeguards surrounding the voluntary admission process would have quite possibly reduced the risk of deprivation. *Ante*, at 135–137. This reasoning conflates the value of procedures for preventing error in the repeated and usual case (evaluated according to the test set forth in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976)) with the value of additional predeprivation procedures to forestall deprivations by state actors bent upon departing from, or indifferent to, complying with established practices. Unsurprisingly, the Court is vague regarding how its proffered procedures would prevent the deprivation Burch alleges, and why the safeguards would not form merely one more set of procedural protections that state employees could willfully, recklessly, and wantonly subvert. Indeed, Burch alleges that, presented with the clearest evidence of his incompetence, petitioners nonetheless wantonly or recklessly denied him the protections of the State's admission procedures and requirements. The state actor so indifferent to guaranteed protections would be no more prevented from working the deprivation by additional procedural requirements than would the mail handler in *Parratt* or the prison guard in *Hudson*. In those cases, the State could have, and no doubt did, provide a range of predeprivation requirements and safeguards guiding both prison searches and care of packages. See *Parratt*, 451 U. S., at 530; *id.*, at 543 ("[T]he deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure. There is no contention that the procedures themselves are inadequate . . ."). In all three cases, the unpredictable, wrongful departure is beyond

the State's reasonable control. Additional safeguards designed to secure correct results in the usual case do not practicably forestall state actors who flout the State's command and established practice.

Even indulging the Court's belief that the proffered safeguards would provide "some" benefit, *Parratt* and *Hudson* extend beyond circumstances in which procedural safeguards would have had "negligible" value. *Ante*, at 129. In *Parratt* and *Hudson* additional measures would conceivably have had some benefit in preventing the alleged deprivations. A practice of barring individual or unsupervised shakedown searches, a procedure of always pairing or monitoring guards, or a requirement that searches be conducted according to "an established policy" (the proposed measure rejected as unnecessary in *Hudson, supra,* at 528–530) might possibly have helped to prevent the type of deprivation considered in *Hudson*. More sensible staffing practices, better training, or a more rigorous tracking procedure may have averted the deprivation at issue in *Parratt*. In those cases, like this one, the State knew the exact context in which the wrongful deprivation would occur. Yet the possibility of implementing such marginally beneficial measures, in light of the type of alleged deprivation, did not alter the analysis. The State's inability to foresee and to forestall the wrongful departure from established procedures renders additional predeprivation measures "impracticable" and not required by the dictates of due process. See *Hudson, supra,* at 533; *Parratt, supra,* at 541.

Every command to act imparts the duty to exercise discretion in accord with the command and affords the opportunity to abuse that discretion. The *Mathews* test measures whether the State has sufficiently constrained discretion in the usual case, while the *Parratt* doctrine requires the State to provide a remedy for any wrongful abuse. The Court suggests that this case differs from *Parratt* and *Hudson* because petitioners possessed a sort of delegated power. See *ante*,

at 135–138. Yet petitioners no more had the delegated power to depart from the admission procedures and requirements than did the guard in *Hudson* to exceed the limits of his established search and seizure authority, or the prison official in *Parratt* wrongfully to withhold or misdeliver mail. Petitioners' delegated duty to act in accord with Florida's admission procedures is akin to the mail handler's duty to follow and implement the procedures surrounding delivery of packages, or the guard's duty to conduct the search properly. In the appropriate circumstances and pursuant to established procedures, the guard in *Hudson* was charged with seizing property pursuant to a search. The official in *Parratt* no doubt possessed some power to withhold certain packages from prisoners. *Parratt* and *Hudson* distinguish sharply between deprivations caused by unauthorized acts and those occasioned by established state procedures. See *Hudson, supra,* at 532; *Parratt, supra,* at 541; accord, *Logan,* 455 U. S., at 435–436. The delegation argument blurs this line and ignores the unauthorized nature of petitioners' alleged departure from established practices.

The suggestion that the State delegated to petitioners insufficiently trammeled discretion conflicts with positions that the Court ostensibly embraces. The issue whether petitioners possessed undue discretion is bound with, and more properly analyzed as, an aspect of the adequacy of the State's procedural safeguards, yet the Court claims Burch did not present this issue and purports not to decide it. See *ante,* at 117, and n. 3, 135–136; but see *infra,* at 150–151. By suggesting that petitioners' acts are attributable to the State, cf. *ante,* at 135–136, the Court either abandons its position that "Burch does not claim that he was deprived of due process by an established state procedure," *ante,* at 117, n. 3, or abandons *Parratt* and *Hudson*'s distinction between established procedures and unauthorized departures from those practices. Petitioners were not charged with formulating policy, and the complaint does not allege widespread and

common departure from required procedures. Neither do the Court's passing reflections that a hearing is constitutionally required in the usual case of treatment of an incompetent patient advance the argument. *Ante,* at 117, 135. That claim either states the conclusion that the State's combined admission procedures are generally inadequate, or repudiates *Parratt*'s and *Hudson*'s focus upon random and unauthorized acts and upon the State's ability to formulate safeguards. To the extent that a liberty interest exists in the application of the involuntary admission procedures whenever appropriate, it is the random and unauthorized action of state actors that effected the deprivation, one for which Florida also provides adequate postdeprivation process. See Fla. Stat. § 768.28(1) (1981) (partial waiver of immunity, allowing tort suits); § 394.459(13) (providing action against "[a]ny person who violates or abuses any rights or privileges of patients" provided by the Florida Mental Health Act).

The Court's delegation of authority argument, like its claim that "we cannot say that predeprivation process was impossible here," *ante,* at 136, revives an argument explicitly rejected in *Hudson.* In *Hudson,* the Court rebuffed the argument that "because an agent of the state who intends to deprive a person of his property *can* provide predeprivation process, then as a matter of due process he must do so." 468 U. S., at 534 (internal quotation omitted). By failing to consider whether "the *state* cannot possibly know in advance" of the wrongful contravention and by abandoning "[t]he controlling inquiry . . . whether the state is in a position to provide for predeprivation process," the Court embraces the "fundamental misunderstanding of *Parratt.*" *Ibid.* Each of the Court's distinctions abandons an essential element of the *Parratt* and *Hudson* doctrines, and together they disavow those cases' central insights and holdings.

The Court's reliance upon the State's inappropriate delegation of duty also creates enormous line-drawing problems. Today's decision applies to deprivations occasioned by state

actors given "little guidance" and "broadly delegated, uncircumscribed power" to initiate required procedures. *Ante*, at 135, 136. At some undefined point, the breadth of the delegation of power requires officials to channel the exercise of that power or become liable for its misapplications. When guidance is provided and the power to effect the deprivation circumscribed, no liability arises. And routine exercise of the power must be sufficiently fraught with the danger of "erroneous deprivation." *Ante*, at 136. In the absence of this broadly delegated power that carries with it pervasive risk of wrongful deprivation, *Parratt* and *Hudson* still govern. In essence, the Court's rationale applies when state officials are loosely charged with fashioning effective procedures or ensuring that required procedures are not routinely evaded. In a roundabout way, this rationale states the unexceptional conclusion that liability exists when officials' actions amount to the established state practice, a rationale unasserted in this case and, otherwise, appropriately analyzed under the *Mathews* test.

The Court's decision also undermines two of this Court's established and delicately related doctrines, one articulated in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), and the other articulated in *Parratt*. As the Court acknowledges, the procedural component of the Due Process Clause requires the State to formulate procedural safeguards and adequate post-deprivation process sufficient to satisfy the dictates of fundamental fairness and the Due Process Clause. *Ante*, at 127. Until today, the reasoning embodied in *Mathews* largely determined that standard and the measures a State must establish to prevent a deprivation of a protected interest from amounting to a constitutional violation. *Mathews* employed the now familiar three-part test (considering the nature of the private interest, efficacy of additional procedures, and governmental interests) to determine what predeprivation procedural safeguards were required of the State. 424 U. S., at 335. That test reflects a carefully crafted accommodation

of conflicting interests, weighed and evaluated in light of what fundamental fairness requires. *Parratt* drew upon concerns similar to those embodied in the *Mathews* test. For deprivations occasioned by wrongful departures from unchallenged and established state practices, *Parratt* concluded that adequate postdeprivation process meets the requirements of the Due Process Clause because additional predeprivation procedural safeguards would be "impracticable" to forestall these deprivations. 451 U. S., at 541. The *Mathews* and *Parratt* doctrines work in tandem. State officials able to formulate safeguards must discharge the duty to establish sufficient predeprivation procedures, as well as adequate postdeprivation remedies to provide process in the event of wrongful departures from established state practice. The doctrines together define the procedural measures that fundamental fairness and the Constitution demand of the State.

The Court today discovers an additional realm of required procedural safeguards. Now, all procedure is divided into three parts. In place of the border clearly dividing the duties required by *Mathews* from those required by *Parratt*, the Court marks out a vast terra incognita of unknowable duties and expansive liability of constitutional dimension. The *Mathews* test, we are told, does not determine the State's obligation to provide predeprivation procedural safeguards. Rather, to avoid the constitutional violation a State must have fully circumscribed and guided officials' exercise of power and provided additional safeguards, without regard to their efficacy or the nature of the governmental interests. Even if the validity of the State's procedures is not directly challenged, the burden is apparently on certain state actors to demonstrate that the State sufficiently constrained their powers. Despite the many cases of this Court applying and affirming *Mathews*, it is unclear what now remains of the test. And the *Parratt* doctrine no longer reflects a general interpretation of the Due Process Clause or the complement of the principles contained in *Mathews*. It is, instead, dis-

placed when the State delegates certain types of duties in certain inappropriate ways. This resulting "no man's land" has no apparent boundaries. We are provided almost no guidance regarding what the Due Process Clause requires, how that requirement is to be deduced, or why fundamental fairness imposes upon the States the obligation to provide additional safeguards of nearly any conceivable value. We are left only with the implication that where doubt exists, liability of constitutional dimension will be found. Without so much as suggesting that our prior cases have warned against such a result, the Court has gone some measure to " 'make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.' " *Parratt*, 451 U. S., at 544 (quoting *Paul* v. *Davis*, 424 U. S. 693, 701 (1976)).

The Court's departure from the *Mathews* and *Parratt* doctrines is particularly unjustified because it is unnecessary for resolution of this case. While I believe that Burch's complaint and subsequent argument do not properly place before the Court a traditional challenge to Florida's voluntary admission procedures, the Court, without so declaring, has decided otherwise. Yet, rather than acknowledge this course, the Court crafts its doctrinal innovations..

Understandably reluctant to grapple with Burch's framing of his complaint, the Court less understandably avoids that difficulty of pleading by creating the innovation which so disrupts established law. The Court discovers that "Burch's suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws." *Ante*, at 136. That is, Burch's suit is not one that established law supports, and thus requires today's unwarranted departure.

The Court believes that Florida's statutory scheme contains a particular flaw. *Ante*, at 135–137. That statutory omission involves the determination of competence in the

course of the voluntary admission process, and the Court signals that it believes that these suggested additional safeguards would not be greatly burdensome. *Ante*, at 135–138. The Court further believes that Burch's complaint and argument properly raise these issues and that adopting the additional safeguards would provide relevant benefit to one in Burch's position. The traditional *Mathews* test was designed and, until today, has been employed to evaluate and accommodate these concerns. See *Washington* v. *Harper*, *post*, at 228–235 (applying *Mathews* test, rather than approach suggested today, to evaluate the adequacy of a State's procedures governing administration of antipsychotic drugs to prisoners). That test holds Florida to the appropriate standard and, given the Court's beliefs set out above, would perhaps have yielded a result favoring respondent. While this approach, if made explicit, would have required a strained reading of respondent's complaint and arguments, that course would have been far preferable to the strained reading of controlling procedural due process law that the Court today adopts. Ordinarily, a complaint must state a legal cause of action, but here it may be said that the Court has stated a novel cause of action to support a complaint.

I respectfully dissent.