**J.W. GANT & ASSOCIATES, INC. and Frank Louis Palumbo, Plaintiffs,**

v.

**NATIONAL ASSOCIATION of SECURITIES DEALERS, INC., Defendant.**

**Civ. A. No. 92–137–SLR.**

United States District Court, D. Delaware.

April 15, 1992.

---

Edward M. McNally, Barbara Mac-Donald, of Morris, James, Hitchens & Williams, Wilmington, Del. (Jeffrey S. Rosen, Ralph V. DeMartino, of DeMartino, Finkelstein, Rosen & Virga, and Anthony W. Djinis, Mari–Ann Pisarri, of Pickard and Djinis, Washington, D.C., of Counsel), for plaintiffs.

John J. Flood, of Nat. Ass'n of Securities Deals, Inc., Washington, D.C., for defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

### INTRODUCTION

Before the Court is a motion for temporary restraining order filed by the plaintiffs, J.W. Gant & Associates, Inc. ("Gant") and Frank Louis Palumbo ("Palumbo"), against defendant, the National Association of Securities Dealers, Inc. ("NASD"). (Docket item, "D.I.", 1) Plaintiffs seek to enjoin the imposition of sanctions which may follow an adverse decision of the NASD's three member hearing panel of the Market Surveillance Committee ("the Committee").[1]

According to the record, Gant is a securities broker-dealer registered with the Securities Exchange Commission ("SEC") and with all fifty states and the District of Columbia. It is a member firm of defendant NASD. Gant services approximately 50,568 retail customer accounts through fourteen offices with approximately 435 registered representatives; it employs approximately 532 people. Gant currently makes a market in the securities of over 91 companies, most of which qualify for listing on NASDAQ, the automated quotation service operated by defendant NASD. Gant is a wholly-owned subsidiary of J.W. Gant Financial, Inc., a publicly-held company incorporated under the laws of Delaware. The other plaintiff in this action, Mr. Palumbo, has been Gant's Chief Executive Officer and Director of Corporate Finance since on or about June 12, 1990. At all relevant times, Palumbo has been registered with the NASD as an "associated person" of Gant. (D.I. 5 at 5)

Defendant NASD is a not-for-profit self-regulatory organization registered with the SEC as a national securities association pursuant to Section 15A of the Securities Exchange Act of 1934 ("Exchange Act"). The NASD is statutorily mandated to conduct investigations and disciplinary proceedings of member firms and their associated persons to enforce compliance with federal securities laws and regulations, including those regulations which govern the over-the-counter ("OTC") securities industry. (D.I. 7 at 1)

### THE EXPEDITED REMEDIAL PROCEEDING

On February 28, 1992, the Committee filed a complaint against Gant and Palumbo alleging, *inter alia*, that during the period from on or about September 16, 1991 through on or about November 8, 1991, Gant, acting through Palumbo, "used its dominant and controlling position" in Bali common stock to sell such stock to its retail customers with excessive mark-ups; further, that such conduct "is part of a continuing pattern of charging excessive mark-ups to its customers in securities in which [Gant] dominates and controls the markets...." (D.I. 1, Ex. L)

The complaint was filed pursuant to Article XI of the NASD Code of Procedure ("Code"), which provides for "expedited remedial proceedings". NASD Code Art. XI,

---

**1.** Although plaintiffs in their verified complaint seek to enjoin the hearing itself, they indicated to the Court during oral argument held March 13, 1992, of concern is the imminent imposition of sanctions without provision for an automatic stay pending review through the appeals process. (D.I. 13 at 4)

Sec. 1 ¶ 3151. (D.I. 1, Ex. C) In accordance with such proceedings, the Committee scheduled hearings on its complaint against Gant and Palumbo for March 16 and March 17, 1992.[2] NASD Code Art. XI, Sec. 2 ¶ 3152. (D.I. 1, Exs. C, M) A Committee hearing panel is required to issue its written decision within five business days of the conclusion of a hearing. Any sanctions[3] imposed by virtue of an adverse decision may remain in effect for a period not to exceed six months. NASD Code Art. XI, Sec. 3 ¶ 3153. (D.I. 1, Ex. C) Although the Committee's decision is subject to an expedited review proceeding (upon motion of the Committee or upon application of any person aggrieved), "[t]he institution of a review ... shall not operate as a stay of the decision." NASD Code Art. XI, Sec. 4, ¶ 3154. (D.I. 1, Ex. C)

THE CONTENTIONS AT BAR

Plaintiffs argue generally that the expedited remedial proceeding at issue poses both procedural and substantive problems warranting this Court's intervention. With respect to the former, plaintiffs initially contend that the expedited hearing has deprived them of the opportunity to pursue discovery and present a meaningful defense, thus depriving them of the opportunity to create a sufficient factual record for purposes of review. The expedited nature of the proceeding is a particularly ill-suited forum, according to plaintiffs, to enforce the NASD's mark-up policy as it applies to market-makers, such as plaintiffs, who are alleged to "dominate and control" certain markets.[4] Plaintiffs argue in this regard that "[t]he question of fair mark-ups or spreads" generally is a question to which "[n]o definitive answer" has or can be given; the question of whether a mark-up is "fair and reasonable" in markets "dominated and controlled by a market-maker" is even less clearly defined. (D.I. 1, Exs. E, F) The mark-up policy, such as it is, is being enforced by the NASD as if it were a rule, although it has not been promulgated in accordance with the requirements of the Act or the Code. Plaintiffs conclude that, without clearly defined standards in place governing the allegedly violative conduct, the expedited remedial proceeding violates the due process requirements regarding fair notice and a meaningful opportunity to be heard as described in the Act, the Code and the U.S. Constitution. Plaintiffs submit that they are entitled to a temporary restraining order to preserve the status quo and prevent irreparable harm under the standards applied by this Court. Plaintiffs further argue that they need not exhaust their administrative remedies before applying for injunctive relief, because to do so would expose them to irreparable harm and because the NASD's actions involve a clear violation of law.

The NASD opposes plaintiffs' motion, arguing that plaintiffs' claims should be dismissed pursuant to Fed.R.Civ.P. 12(h)(3) for lack of subject matter jurisdiction due to the plaintiffs' failure to exhaust administrative remedies. Defendant also asserts that plaintiffs have failed to satisfy the four prerequisites to extraordinary injunctive relief restraining NASD from exercising its regulatory authority and, finally, that plaintiffs do not have an express or implied private right of action against the NASD under the Exchange Act or under NASD rules. (D.I. 7)

Oral argument was heard on March 13, 1992. (D.I. 13) For the reasons that follow, plaintiffs' motion will be denied. More specifically, I conclude that this Court lacks subject matter jurisdiction over the matter due to plaintiffs' failure to exhaust administrative remedies. I, therefore, do not address the remainder of defendant's arguments.

---

**2.** The hearing was adjourned after three days of testimony. Testimony is expected to resume on May 13, 1992.

**3.** Membership in the NASD may be conditioned or suspended.

**4.** Plaintiffs note in this regard that defendant instituted a "regular NASD disciplinary proceeding regarding the same subject matter" in December 1991, which proceeding incorporates the procedural safeguards plaintiffs seek in the action at bar. *Market Surveillance Committee v. J.W. Gant & Associates, Inc., et al.*, Complaint No. CMS 910205 ("Boca/TAPEW Case").

## DISCUSSION

The doctrine of administrative exhaustion has been found to apply to the disciplinary proceedings of the NASD. *First Jersey Securities, Inc. v. NASD*, 605 F.2d 690, 696 (3d Cir.1979), *cert. denied* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). The Third Circuit has identified several policies underlying the exhaustion requirement.

> First, adherence to the doctrine shows appropriate deference to Congress' decision, embodied in statute, that an independent administrative tribunal, and not the courts, should serve as the initial forum for dispute resolution.... Second, the exhaustion doctrine illustrates respect for administrative autonomy by forbidding unnecessary judicial interruption of the administrative process. This autonomy allows the administrative tribunal to exercise its own discretion, apply its own special expertise, and correct its own errors, thereby promoting administrative responsibility and efficiency and minimizing the frequent and deliberate flouting of administrative processes which could weaken the tribunal's effectiveness. Third, the exhaustion requirement fosters judicial economy both by permitting the administrative tribunal to vindicate a complaining party's rights in the course of its proceedings, thereby obviating judicial intervention, and by encouraging the tribunal to make findings of fact on which courts can later rely in their decisionmaking.

*Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 293 (3d Cir.1982) (citations and footnote omitted). The Third Circuit has recognized as well, however, several exceptions to the exhaustion requirement. The exceptions are triggered if: 1) "administrative remedies would be futile"; 2) "the administrative procedure is clearly shown to be inadequate to prevent irreparable injury"; or 3) "the actions of the agency clearly and unambiguously violate statutory or constitutional rights". *Lyons v. U.S. Marshals*, 840 F.2d 202, 205 (3d Cir.

1988). Plaintiffs urge that one or more of these exceptions excuse their failure at bar to exhaust their administrative remedies.

*Futility of Administrative Remedies.*

■ With respect to the first exception, plaintiffs argue that the expedited remedial proceeding does not provide for a " 'review procedure' that permits an administrative agency to correct errors by hearing panels to prevent those errors from harming a litigant". Plaintiffs contend that the decision of the Committee, "however flawed, is effectively final", for "any appeal from such a decision 'shall not operate as a stay....' ". (D.I. 5 at 39) Plaintiffs cite to *First Jersey* in support of this contention, where the Third Circuit, in denying relief, noted that a decision by the NASD to impose sanctions "would be subject to the statutorily prescribed review procedure, including review by the Court of Appeals". 605 F.2d at 696. No mention is made by the Court, however, of any stay provisions. Further, my understanding of Article XI of the Code is that the same review procedure described in *First Jersey* is in fact available to the parties in an expedited remedial proceeding. *See* Code, ¶¶ 3154, 3155, 3158. (D.I. 1, Ex. C; *see also* D.I. 7 at 11, 12; D.I. 13 at 24: "There is no provision for ... appellants in a normal Article II disciplinary case to obtain a stay from the NASD while the matter is before the SEC....") I decline to find, therefore, that the administrative remedies available at bar are futile.

*Irreparable Harm.*

■ Plaintiffs contend that, even if a review procedure is in place, the absence of a provision automatically staying the imposition of sanctions pending completion of the review process will lead to irreparable harm, namely, that

> even a temporary suspension by an NASD hearing panel would mean immediate unemployment for Gant's 532 employees and unanswered telephones for the firm's approximately 50,568 retail customers. With regard to Mr. Palumbo, a suspension would mean not only the loss of his job, but the loss of his

entire career. He could not accept employment from another broker-dealer.

The fact that Gant and Mr. Palumbo may ultimately prevail on an appeal ... does not negate a finding of irreparable harm here. In a recession economy, with fierce competition for business, it would take no time at all for Gant's customer base and sales force to be cannibalized by its competitors.

(D.I. 5 at 36–7) Plaintiffs also present in support of their irreparable harm argument the averments of J. Patrick Driver, plaintiff Gant's Compliance Director. Mr. Driver avers that: 1) plaintiff Gant is a "major employer as well as an enormous user of office space, utilities, office supplies, and office services[;] the continuation of such consumption of services is vital to the economies of the areas in which its offices are located"; 2) any suspension restriction or sanction of Gant "could devastate" the pension and profit sharing funds of Gant's employees; 3) any suspension restriction or sanction of Gant "would strip" the owners of Gant common and preferred stock of the value of their investment; 4) "[t]he uninterrupted services and functions of [Gant] as a broker-dealer ... is essential to the welfare of each customer's investments"; 5) "[t]he loss of [Gant] as a market maker would be severely detrimental to each owner of securities in which [Gant] is a market maker ..."; 6) "[Gant] is a major player in the continuing and necessary capitalist system of raising money for new and growing businesses through public offerings of equity securities"; 7) "the loss or impairment of [Gant] could create wide spread adverse 'emotional' repercussions throughout the securities industry as a result of the loss of an industry leader and vital supporter of the NASDAQ market for growth industries"; 8) "[a]ny impairment of the business and economic functions of [Gant] could create great and irreparable disruption of the securities market niche of growing companies as well as severe and lasting injury to the economy"; and 9) "[a]ny impairment of the business functions of [Gant] would have an instant and devastating effect on the value of the common and preferred shares" of its parent company. Mr. Driver concludes: "In summary, literally tens of thousands of persons would be immediately, substantially, and irreparably injured by even a twenty-four hour suspension of J.W. Gant & Associates, Inc.'s functions." (D.I. 3)

In response, defendant submits that Gant in 1989 survived a six month suspension "from being a market maker in or otherwise trading on a principal basis in a non-NASDAQ security except where a component of such security is traded on NASDAQ." (D.I. 7 at 21) Defendant further contends that Gant's forecast of economic devastation . are overstated; otherwise, Gant should disclose (but has not disclosed) such material information to present and potential shareholders. At oral argument, defendant offered the following with respect to the prospect of Gant's suffering irreparable harm: 1) Gant is one of two broker-dealers owned by the parent company, J.W. Gant Financial, Inc.; 2) Gant's 435 registered representatives are less than one tenth of one percent of the registered representatives in the United States; 3) Gant is one of over 4,500 broker-dealers in the United States; 4) as to every one of the 106 stocks or stock derivative products in which Gant made markets as of March 9, 1992, there were at least three market makers; 5) the concerns of Gant and its employees "are indistinguishable from those of any other securities firm" against which disciplinary proceedings have been instituted. (D.I. 13 at 21) Defendant concludes that the regulations governing expedited remedial proceedings were promulgated properly and were approved by the SEC "as being consistent with the Act and providing fair procedures for disciplinary proceedings of broker-dealers in the securities industry." (D.I. 13 at 38)

Without minimizing the concerns of Gant's employees, shareholders and the public at large, I agree with defendant that the sweeping generalizations made by affiant Driver with respect to the importance of Gant to the securities industry and the economy at large are too speculative to warrant judicial intervention on the basis of irreparable harm. The harm which

could come to Gant's employees and shareholders in the event sanctions are imposed immediately is more apparent. It is difficult to determine from the record at bar, however, whether the apparent harm is irreparable, or incapable of being remedied. On the one hand, Gant contends that any suspension of its rights to conduct business would allow its competitors to cannibalize its customer base and sales force and would devalue the common and preferred stock of Gant's parent company, and thus the pension and profit sharing plans of plaintiffs' employees. On the other hand, one must presume that such dramatic consequences from the immediate imposition of sanctions were evident to, specifically contemplated by, and perhaps, even a goal of the NASD and the SEC when the regulations governing the expedited remedial proceedings were approved. For the Court to step in and maintain the status quo in the case at bar pending the review process would, to a great extent, undermine the effectiveness of such proceedings and invite future judicial intervention whenever any expedited remedial proceeding is noticed. Given the underlying purpose of such proceedings, the fact that the procedures governing such proceedings were properly promulgated, and the fact that Gant itself has survived the imposition of similar sanctions, albeit several years ago, I embrace the reasoning and conclusion of the Third Circuit in *First Jersey* in this regard, where the applicants for relief were facing permanent suspension:

> [I]f [the irreparable injury] exception were to be applied in this case, it would likewise apply in every case where the NASD contemplated disciplinary proceedings. Any company threatened by an NASD hearing could run into district court claiming that the imposition of sanctions would result in irreparable injury. To allow such interruption would frustrate the self-regulatory scheme envisioned by Congress in passing the Maloney Act. Although we recognize the potential for harm that exists, we believe that the integrity of the administrative

process requires us to reject this justification for intrusion.

605 F.2d at 696–97.

### *Clear and Unambiguous Violation.*

■ As noted above, plaintiffs maintain that the expedited remedial proceeding at bar is violative in two basic respects of plaintiffs' due process rights under the Act, NASD's bylaws and Code of Procedure, and the U.S. Constitution: 1) the expedited remedial proceeding itself, primarily because it fails to provide for a stay of any adverse decision pending final appellate review; and 2) the subject matter of the expedited remedial proceeding, the NASD mark-up policy, which is being enforced as though it were a rule when, in fact, it has not been properly adopted as a rule.

Initially, contrary to defendant's contention, "the due process clause does insure the fundamental fairness of ... administrative hearing[s]", including NASD hearings. *See Mister Discount Stockbrokers, Inc. v. Securities Exchange Commission*, 768 F.2d 875, 878 (7th Cir.1985). Consequently, the issue before the Court is whether the expedited remedial proceeding "so prejudice[s] a party as to deny him due process." *Id.* As recently described by the Supreme Court,

> [d]ue process ... is a flexible concept that varies with the particular situation. To determine what procedural protections the Constitution requires in a particular case, we weigh several factors: "First, the private interests that will be affected by the official actions; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 [96 S.Ct. 893, 903, 47 L.Ed.2d 18] (1976).

Applying this test, the Court usually has held that the Constitution requires some

kind of a hearing *before* the State deprives a person of liberty or property. *Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990). "Due process does not require a particular form or manner of hearing, but rather requires only an opportunity to be heard appropriate to the circumstances." *Lashner v. The Mutual Assurance Co.,* 1991 WL 224586 at 3, 1991 U.S.Dist.LEXIS 15127 at 8 (E.D.Pa.1991).

With respect to plaintiffs' request for a stay, this is not a situation where plaintiffs are requesting a stay of proceedings for failure of the administrative agency to provide an opportunity for a hearing before property is permanently taken. *See Lashner v. The Mutual Assurance Co.,* 1991 U.S.Dist.LEXIS 15127 at 3; *compare Schall v. Joyce,* 885 F.2d 101 (3d Cir.1989). Rather, plaintiffs are requesting a predeprivation remedy in addition to notice and an opportunity to be heard, i.e., a stay of the imposition of sanctions pending final appellate review.

Looking to the factors described in *Zinermon,* 494 U.S. at 127, 110 S.Ct. at 984, it is undisputed that the private interests at stake are substantial. *See, e.g., Jaunich v. Minneapolis Grain Exchange,* Civil No. 4–91–568, 1991 WL 349902 (D.Minn.1991). (D.I. 15) Plaintiffs would further argue that the expedited nature of these disciplinary proceedings substantially increases "the risk of an erroneous deprivation of such interest[s]", a risk which would be alleviated by the additional procedural safeguard of a stay. In contrast, defendant's interests in regulating those members who are engaging in a continuing course of "egregious" conduct which is "inconsistent with just and equitable principles of trade", likewise is substantial.[5] If the additional procedural safeguard of a stay were superimposed upon the administrative process, the very nature of the administrative process would be changed, arguably under-

mining the very purpose of such proceedings. Given the standard under which we are operating—that of a clear and unambiguous violation—I cannot conclude that the absence of an automatic stay provision in the expedited remedial procedure is clearly violative of plaintiffs' due process rights.

 Nor can I conclude that the NASD's mark-up policy is being enforced as a rule and is so ambiguous as to constitute a statutory violation. Although the NASD concedes that "[n]o definitive answer can be given" to "[t]he question of fair mark-ups or spreads" (D.I. 1, Ex. D), the NASD mark-up policy is based on dealing with customers at prices that are "fair and reasonable" (D.I. 1, Ex. E), as those terms have been interpreted in like circumstances in the past. Moreover, the allegation that plaintiffs dominated and controlled over 90% of the market in Bali Securities does not appear to require subtle interpretations of the phrase "domination and control". *See, e.g., In Re Alstead Dempsey & Co., Inc.,* 47 SEC 1034 (1984).

## CONCLUSION

For the reasons stated, I conclude that, pursuant to Fed.R.Civ.P. 12(h), this Court lacks subject matter jurisdiction over plaintiffs' claims for relief.

Given the unusual circumstances underlying plaintiffs' claims, i.e., plaintiffs' case being the first expedited remedial proceeding instituted by the NASD and its involving complex issues, I decline to award defendant NASD attorney fees and costs.

An order consistent with this Memorandum Opinion shall issue.

---

5. Plaintiffs raise the question as to whether their conduct properly can be categorized as "egregious" where it already is the subject of a "regular" NASD disciplinary proceeding which forms the basis for the expedited disciplinary proceeding and where the substantive issue

(NASD's mark-up policy) is less than clearly defined. The question of whether this case is a proper case for adjudication under the expedited remedial proceeding is not a proper question for this Court to address, however.