Bennet LEVIN, Appellant,

v.

UPPER MAKEFIELD TOWNSHIP, Bucks County, Pennsylvania; Rose Marie Sauter; Conrad Baldwin; William Gunser; Edward X Ford; John Titterton; Lawrence Saltzman; John Walsh; Barbara Hirst; Robert Gorring; Eric Fisher; Michael Frank; Steven Harris, Esquire; Gregory Sturn, Esquire; Harris & Harris, Attorneys; John Devlin; Mary Devlin; Jonathan Lamm; Mary Lamm; Thomas Kovacevich; Mary Kovacevich; Deborah Devlin; Donna v. Lamm.

No. 03–1860.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Feb. 12, 2004.

Decided March 8, 2004.

Steven H. Lupin, Hamburg, Rubin, Mullin, Maxwell & Lupin, Lansdale, PA, for Appellant.

H. Robert Fiebach, Kristine Maciolek, Cozen & O'Connor, Bernard E.J. Quinn, German, Gallagher & Murtagh, Philadelphia, PA, for Appellee.

Before SCIRICA, Chief Judge, and ROTH and MCKEE, Circuit Judges.

## OPINION

McKEE, Circuit Judge.

Bennet Levin has filed this appeal from the district court's grant of summary judgment in favor of the defendants in his § 1983 action in which he alleged that the defendants' conduct in opposing his application for a zoning variance violated his substantive due process rights and constituted state law torts of civil conspiracy and abuse of process. For the reasons that follow, we will affirm the district court.

## I. FACTUAL BACKGROUND

In June 1997, Levin purchased two lots, approximating seven acres of unimproved land (the "Property") bisected by River Road in Upper Makefield Township, Bucks County, Pennsylvania. Levin wanted to build a single family home on the 4.009 acre lot for himself and his wife. The Property borders the Delaware River on one side and the Delaware Division of the Pennsylvania Canal on the other. As a result of its location and topography, the Property is classified as being located in a floodplain as depicted on Federal Emergency Management Administration maps and as set forth in the Township's Joint Municipal Zoning Ordinance ("JMZO"). The Property is zoned Conservation Management Zoning District ("CMZD"). Levin claims that the CMZD permits single family homes by right and also lies within the overlay Floodplain Zoning District (the "Floodplain"), which consists of the flood fringe and the floodway.

The Township, its Board of Supervisors, its Zoning Hearing Board ("ZHB") mem-

bers and its Solicitors (collectively the "Township") claim that long before Levin purchased the Property he knew that it was located within the floodplain and, therefore, he would have to obtain a variance to build in the floodplain. The Township also claims that before he purchased the Property, Levin learned that the prior owner had applied for a variance to construct a single-family residence on the Property several years earlier and that the variance had been denied. Yet, notwithstanding this knowledge (or perhaps because of it), Levin purchased the Property at a substantial discount.

Levin says that before he purchased the Property, he met with Township Code Enforcement Officer David Kuhns on at least two occasions and was told there was no official policy in the Township that precluded Levin from building his home. According to Levin, the only requirement was compliance with § 905 of the Township Zoning Ordinance and other applicable sections of the Zoning Ordinance. Levin claims that he purchased the Property relying on Kuhn's representations.

For its part, the Township asserts that the Property is governed by both the provisions of the JMZO, the local zoning ordinance which applies in the Township as well as several other neighboring townships, and the Municipalities Planning Code, the Pennsylvania statute governing the land use process. The JMZO not only addresses the criteria for the CMZD in which the Property lies, but it also contains a Floodplain District Overlay— § 905—which applies to every property located in a floodplain, including Levin's, and contains additional criteria which must be met in addition to the requirements of other normal zoning districts.

The purpose of § 905 is "to prevent the loss of property and life, the creation of health and safety hazards, the disruption of commercial and government services, the extraordinary and unnecessary expenditure of public funds for flood protection and relief, and the impairment of the tax base." JMZO § 905(I)(A). The Township claims, contrary to Levin's assertion, that new residential construction is not permitted as of right or by special exception under § 905. Rather, it is incumbent upon an applicant to request and obtain a variance. Section 905 itemizes a number of considerations the ZHB must consider when deciding whether to grant a variance application for construction in the floodplain. Among the many considerations outlined are the following:

- The danger to life and property due to increased flood heights or velocities caused by encroachments. No special exception or variance shall be granted for any proposed use, activity, or development that will cause any increase in the one hundred (100) year flood levels in the Floodplain District as delineated in the Flood Insurance Study referenced in Section 905.III.A.I.

- The safety of access to the property by ordinary and emergency vehicles in time of flood.

JMZO § 905(IV)(E)(1)(a) and (j).

In addition to the criteria for obtaining a variance set forth in § 905, the JMZO also requires that "variances shall be in accordance with the provisions of the Pennsylvania Municipalities Planning Code ('MPC')." JMZO § 1507(D). In deciding whether to grant a variance, § 10910.1 of the MPC provides:

The board may grant a variance, provided that all of the following findings are made where relevant in a given case:

(1) That there are unique physical circumstances or conditions ... peculiar to the particular property ...

(2) That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance ...

(3) That such unnecessary hardship has not been created by the appellant.

(4) That the variance, if authorized ... [would not] be detrimental to the public welfare.

(5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

53 P.S. § 10910.2. The Township contends these requirements are mandated by state law and the JMZO. According to the Township, applicants such as Levin who seek to build new construction in the floodplain must meet three different sets of requirements: (1) the criteria set forth in their specific Zoning District (for Levin, the requirements of CMZD); (2) the criteria contained in the § 905, the floodplain overlay; and (3) the five-pronged test set forth in § 10910.2 of the MPC and incorporated into the JMZO.

On November 24, 1997, Levin submitted an application for a zoning variance which included a request for a hearing before the ZHB to obtain a variance to construct a single-family detached dwelling within the 100–year floodway fringe of the Delaware River (the "Application"). Levin claims that the lot he wanted to build on lies within the flood fringe, which is located outside of the floodway, the area that carries the large bulk of any 100–year floodwaters. The Application contained materials prepared by his engineer, among which was a HEC–II study required by § 905 of the JMZO. According to Levin, the HEC–II study measures whether a proposed structure improvement would cause a rise in the 100–year flood and whether the proposed structure causes backwater on the upstream of the property or a significant increase in the velocity of the river. Levin says that along with his Application, he submitted an existing features plan which identified by size and species all trees located on his property and a plan identifying the proposed location of the home, the proposed location for an on-site sanitary system, the on-site well and the suggested driveway location, as well as actual tests of the soil for percolation and the results of water drawn from a test well that had been drilled to conform to the requirements of § 905.

Upon receiving Levin's Application, Township staff placed it on the agenda for the December 17, 1997, public meeting of the Board of Supervisors for discussion and comment, as they do with every variance application. At the meeting, Stephen Harris on behalf of the Township Solicitor, Harris & Harris, advised the Supervisors that Levin had submitted an Application that requested a variance to construct a single-family home in the floodplain. After Harris provided a brief description of the property and the specific variance sought by Levin, Harris inquired into whether the Supervisors wanted to authorize the Township Solicitor to attend the ZHB meetings and oppose the Application on behalf of the Township. A public discussion was held, members of the public made comments, and a motion was ultimately made to authorize the Solicitor to represent the Board of Supervisors in opposing Levin's Application. The motion carried and the Solicitor was directed to oppose the Application on behalf of the Township. The Supervisors did not approve or deny the variance request itself, as that is left exclusively to the ZHB.

Levin claims that the December 17, 1997 meeting of the Supervisors was the first time many of the five Supervisors actually

saw the Application and none of them claimed to have previously read or considered it. Levin alleges that he was not given notice that his Application would be considered by the Supervisors and that neither he nor his attorney were aware of the meeting so as to be able to present and discuss the Application to the Supervisors. Levin claims the Board's minutes are silent as to any concerns for the public health, safety and welfare of the community due to the Application. He also claims there is no evidence that the Supervisors considered the merits of the application in any respect before voting to oppose it. He further alleges that the minutes do not reflect that the Township Engineer had reviewed the Application as required by § 905. In fact, Levin claims that Township Manager Richard Gestrich confirmed that the Supervisors did not have a report from the Township Engineer at the December 17, 1997 meeting.

According to Levin, on January 20, 1998, Township Engineer Williams, as required by § 905, submitted his findings to the Supervisors stating that the Application was in order and that the required HEC–II study was satisfactory in all respects. Levin also claims that Williams testified that Levin's engineer went beyond the zoning ordinance requirements and included an additional HEC–II study based upon the then unadopted model of the Delaware River floodplain by the U.S. Army Corp of Engineers. Moreover, Levin alleges that Williams testified that the HEC–II study prepared by Levin's engineer was the most complete and thorough analysis of any application that he had reviewed.

Even though the Supervisors had previously authorized the Solicitor to oppose Levin's Application, the issue was raised again the following month inasmuch as the make-up of the Board had changed at the end of 1996 and the ZHB hearings on

Levin's Application had not yet begun. The newly-elected Supervisors held two of the five seats on the Board as of January 5, 1998. After comment and discussion at the January 21, 1998 public meeting, the now-different slate of Supervisors again voted to authorize the Solicitor to represent the Township in opposition to Levin's Application. The Township claims that this was the final direct involvement of the Supervisors in Levin's variance request until the ZHB issued its decision.

The Township claims that even if the Supervisors had not authorized the Solicitor to oppose Levin's Application, and instead had taken no position or had sent the Solicitor to support it, the Application would still be decided by the ZHB based on whether the ZHB concluded that Levin had satisfied the requirements of the Township ordinances, the five-pronged criteria set forth in the MPC, and the JMZO criteria regarding issuance of a variance.

The ZHB held eight evidentiary hearings. During the hearings, Levin put on evidence that he had satisfied all of the relevant portions of § 905 of the JMZO. The Township put on evidence to the contrary, focusing on the inaccessibility of the Property by emergency vehicles (a § 905 factor) and that Levin had not met the five-pronged variance test (§ 10910.2 of the MPC, which is incorporated into the JMZO). The evidence presented to the ZHB centered primarily around two of the five statutory variance criteria: (1) alternative uses of the Property and (2) the public health, safety and welfare. With respect to the former, the parties offered conflicting testimony regarding whether Levin's Property could be used by Levin for alternative uses other than the new construction of a single-family residence.

Both parties presented evidence with respect to the issue of health, safety and welfare. The Township contended that

the proposed use constituted a safety hazard for Levin, the Township and other rescue personnel, and citizens in general. Along these lines, testimony was presented that portions of Levin's Property had been underwater during floods which occurred over the past ten years and beyond and that during such floods ingress and egress to the Property was impossible, thereby presenting a danger to Levin, his family and guests, and rescue personnel, as well as future occupants of the dwelling who might be unaware of the danger. Indeed, claims the Township, several years before, a woman had been killed during a flood on the road that bisects Levin's Property when that road was underwater during a flood. In addition, although Levin presented evidence that construction of his residence would not alter the 100–year flood level by any noticeable percentage, the Township presented evidence that the cumulative effect of building in the floodplain would result in a rise of the floodplain and would also have a corresponding effect on floodwater velocity. Other safety concerns such as displaced sewage and the like were also raised.

Levin disputed this evidence by presenting testimony of remedial measures he intended to take which he believed would alleviate the health, safety and welfare concerns raised by the Township. Levin offered to make installation of these measures a contingency of any variance. However, the Townships claims that Levin now says he will not install these safety features.

At a public hearing on July 30, 1998, the ZHB voted 3 to 0 to deny Levin's Application, and on August 13, 1998, the ZHB issued a written opinion containing its Findings of Fact and Conclusions of Law.

After the ZHB denied Levin's Application, he filed a Land Use Appeal in the Court of Common Pleas of Bucks County on September 9, 1998. The Township filed a Notice of Intervention in the Court of Common Pleas opposing the appeal. On October 7, 1998, at a public meeting, the Board of Supervisors voted in favor of a motion to authorize the Solicitor to represent the Township in the appeal.

On February 23, 1999, Judge John J. Rufe of the Court of Common Pleas issued his initial Memorandum Opinion and Order reversing the ZHB's decision. On March 3, 1999, the Board of Supervisors authorized the Solicitor to file that decision to the Commonwealth Court. Consequently, on May 7, 1999, Judge Rufe issued a Supplemental Opinion. On May 11, 2000, the Commonwealth Court affirmed the Court of Common Pleas' decision.

The Board of Supervisors was presented with the Commonwealth Court's opinion and, on June 7, 2000, passed a unanimous motion authorizing the Solicitor to file petition for allowance of appeal with the Pennsylvania Supreme Court. On June 12, 2000, the petition for allowance of appeal was filed; however, on November 9, 2000, the Pennsylvania Supreme Court denied it without opinion.

Although it has nothing to do with the resolution of this appeal, the Township claims that Levin has obtained his variance but has yet to begin building his home despite having received all of the necessary permits and approvals. However, Levin says that he has taken steps to start construction by clearing the land, putting in a road and grading the area of the house to bring it up to the required elevation.

## II. DISTRICT COURT PROCEEDINGS

On October 26, 1999, Levin filed a complaint in the district against the Township, the members of the Board of Supervisors

in their individual and official capacities, the members of the Zoning Hearing Board in their individual and official capacities, and the Township's Solicitors, in their individual and official capacities. He thereafter filed an amended complaint alleging violations of his substantive and procedural due process rights pursuant to § 1983; conspiracy in violation of § 1983; and state law claims of civil conspiracy, abuse of process and wrongful use of civil process. On October 4, 2000, the Township defendants filed a motion to dismiss the amended complaint and on May 10, 2001, the district court entered an order granting in part and denying in part the motion to dismiss. As a result, the remaining claims were: (1) substantive due process violations pursuant to § 1983 against the Township, the Board of Supervisors, the ZHB and the Solicitors; (2) civil conspiracy against the Township, the Board of Supervisors, the ZHB and the Solicitors; and (3) abuse of process against the Township, the Board of Supervisors and the Solicitors.

Defendants then filed a motion for summary judgment, asserting, *inter alia,* the defense of qualified immunity. On February 25, 2003, the district court entered a memorandum and order granting summary judgment to the defendants on Levin's remaining § 1983 substantive due process claim and his state law claims.

Levin then filed a timely appeal.

## III. DISCUSSION

Levin argues that the district court erred by granting summary judgment to the defendants on his § 1983 substantive due process claim and his state civil con-

spiracy and abuse of process claims. Each argument is considered separately below.

### A. Substantive Due Process.

The due process clause of the Fourteenth Amendment guarantees "more than fair process" and "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citations and internal quotation omitted). That substantive component is intended to prevent government officials from abusing their power or employing it as an instrument of oppression. *Id.* (citation and internal quotations omitted).

Substantive due process violations are actionable under § 1983. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). "To prevail on a non-legislative substantive due process claim, a plaintiff must establish as a threshold matter that he has a protected property interest[1] to which the Fourteenth Amendment's due process protection applies." *Woodwind Estates, Ltd. v. Gretkowski,* 205 F.3d 118, 123 (3d Cir. 2000), *abrogated on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003). We have held that "ownership is a property interest worthy of substantive due process protection." *DiBlasio v. Zoning Board of Adjustment for the Township of West Amwell,* 53 F.3d 592, 600 (3d Cir. 1995), *abrogated on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003). "Indeed, one would be hard-pressed to find a property interest more worthy of sub-

---

1. Levin does not contend here that the Township officials violated a protected liberty inter-

est.

stantive due process protection than ownership." *Id.* at 601.

Thus, it clear that Levin's ownership of the Property is a property interest that is entitled to substantive due process protection. Levin alleges in his § 1983 action that the Township's conduct in opposing his application for a variance violated his substantive due process property rights. However, the Township moved for summary judgment on Levin's substantive due process claim on the basis of, *inter alia,* qualified immunity.

Qualified immunity generally protects government officials performing discretionary functions from civil damages. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity applies so long as the government officials' "conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* In determining whether qualified immunity applies, a court asks: (1) whether the plaintiff has alleged the deprivation of a constitutional right, and if so, (2) whether the right was clearly established at the time of the alleged violation. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). A right is clearly established if "its outlines are sufficiently clear that a reasonable officer would understand that his actions would violate the right." *Sterling v. Borough of*

*Minersville,* 232 F.3d 190, 193 (3d Cir. 2000). Therefore, the court's task " 'is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all,' before reaching the question of whether the right was clearly established at the time." *Johnson v. Newburgh Enlarged School District,* 239 F.3d 246, 251 (2d Cir.2001) (quoting *County of Sacramento v. Lewis,* 523 U.S. at 841 n. 5, 118 S.Ct. 1708).

Prior to January 14, 2003, we took the position that executive action in a land use case violates substantive due process if it was made with any "improper motive." *See Bello v. Walker,* 840 F.2d 1124 (3d Cir.1998). However, on January 14, 2003, we adopted a new, more stringent standard to be applied to substantive due process claims. In *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003), *petition for reh'g en banc denied,* 324 F.3d 133 (3d Cir.2003), which was itself a land use dispute case, we held that the standard to be applied in all cases involving a substantive due process claim is whether the government executive's actions "shock the conscience," and this rule extends to cases arising in the land use context.[2] We were of the opinion that the "improper motive" substantive due process cases were in direct conflict with the Court's decision in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

---

**2.** Levin argues that the "shocks the conscience" test only applies where the state executive actor had to act with urgency. Levin's Br. at 25–26, 33; Reply Br. at 7. But, says Levin, because the Township did not have to act, and did not in fact act, with any urgency, the "shocks the conscience" test does not apply to his substantive due process claim. Consequently, the less-stringent *Bello* "improper motive" test applies.

However, there's nothing in *United Artist* that supports the distinction Levin urges upon us. In fact, *United Artist* makes it clear that

the "shocks the conscience" test applies to *all* substantive due process claims.

Levin also "takes issue" with the *United Artist* decision, claiming that it does not afford an individual any "protection from the irrational and arbitrary actions of the government and its officials." Reply Br. at 6. However, *United Artist* is the law of this circuit and, therefore, his distaste for it is irrelevant. Moreover, the *United Artist* "shocks the conscience standard" is precisely designed to protect an individual from arbitrary and irrational executive action.

In *Lewis*, the Court explained the standard that applies when a plaintiff alleges that action taken by an executive official violates substantive due process.[3] The "core of the concept" of due process is "protection against arbitrary action" and "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." 523 U.S. at 845–46, 118 S.Ct. 1708 (citation omitted). Consequently, "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.* at 846, 118 S.Ct. 1708. "[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.... Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action." *Id.* at 847 n. 8, 118 S.Ct. 1708.

Although "the measure of what is conscience-shocking is not a calibrated yard stick, it does ... point the way." *Id.* at 847, 118 S.Ct. 1708 (citation, internal quotations and brackets omitted). Yet, "deliberate indifference that shocks in one environment may not be so patently egregious in another." *Id.* at 850, 118 S.Ct. 1708. The shocks the conscience "test can be used to mark the beginning point in asking whether or not the objective character of certain conduct is consistent with our traditions, precedents, and historical understanding of the Constitution and its meaning." *Id.* at 857, 118 S.Ct. 1708 (Kennedy, J., concurring) (citing *Collins v. Harker Heights,* 503 U.S. 115, 126–28, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)).

■ Levin argues that the district court erred by granting summary judgment to the Township on his substantive due process claim because there is a genuine issue of material fact as to whether the Township's actions shock the conscience and, therefore, constituted a substantive due process violation However, Levin misunderstands the nature of the inquiry in a case where the state executive officer invokes the defense of qualified immunity. That inquiry is stated on our decision in *Wilson v. Russo,* 212 F.3d 781 (3d Cir. 2000):

The qualified immunity defense requires that we engage in a two-step analysis. First, we must determine whether the plaintiff has alleged the deprivation of a constitutional right at all. Only if he has should we proceed to determine whether that right was clearly established at the time of the alleged violation. Summary judgment is appropriate if no reasonable juror could conclude that [plaintiff's] clearly established rights were violated.

*This does not mean that the jury determines the contours of the right. Rather, after making a legal determination about the existence of a right, and whether it is clearly established, we determine whether the facts on the record are such that a jury could conclude that the clearly established right was violated.* As a methodological matter, we commonly work backwards: We arrange the facts in the light most favorable to the plaintiff, and then determine whether, given precedent, those "facts," if true, would constitute a deprivation of a right. And then, if necessary, we determine if the right is clearly established.

---

**3.** The issue in *Lewis* was "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indif-ference to life in a high-speed automobile chase aimed at apprehending a suspected offender." 523 U.S. at 836, 118 S.Ct. 1708.

212 F.3d at 786 (citations omitted) (emphasis added).

Given the nature of the qualified immunity inquiry, it is necessary for us to look at the facts in the light most favorable to Levin to determine if the Township's actions so shock the conscience that a substantive due process violation occurred. Levin points to a number of instances of Township conduct which he contends "shock the conscience." Each is noted separately below.

(i). Kuhns's representations to Levin.

Levin alleges that on at least two occasions he met with Code Enforcement Officer Kuhns prior to buying the Property and that Kuhns told him that there was no official or unofficial Township policy that precluded Levin from building his home on the Property. Rather, says Levin, Kuhns told him that the only requirement was compliance with § 905 of the JMZO and other applicable zoning ordinances, regulations and statutes. Therefore, says Levin, relying on Kuhns's representations, he bought the Property.

However, we completely fail to understand how this shocks the conscience. Kuhns's representations to Levin were correct. Kuhns told Levin that in order to build on the Property, Levin would have to get a variance. Levin intimates that Kuhns lied to him because there was a Township policy in place to prevent anyone from ever building on the floodplain. That issue is discussed below.

(ii). Official Policy to Prohibit Construction on the Floodplain.

Levin claims that the Township's conduct shocks the conscience because there was a Township[4] policy in place to prevent anyone from ever building in the floodplain and, therefore, the variance application procedure was an sham exercise. However it appears uncontested that the Board of Supervisors had formed the opinion that construction on the floodplain should not be allowed for public safety reasons. For example, in his deposition, Supervisor Baldwin relied on his personal experience to make a determination that Levin's proposed residence would pose a danger to health, safety and welfare. In Baldwin's view, it was unwise to build a single family residence in an area that flooded and, therefore, posed a safety threat to the homeowner and his family. Supervisor Ford testified to similar concerns, and, in addition, focused on the safety of rescue personnel who could be called upon to rescue floodplain homeowners in times of flooding. Supervisor Ford testified that he had personal experience with the Property and had witnessed police and fire personnel rescue neighboring landowners in a 1996 flood. Ford also testified that he was present on River Road, the road that bisects the Property, when a woman drowned there in a flood. Finally, the Board members were concerned with problems associated with surrounding water and sewer systems in times of a flood. Supervisor Ford testified that he witnessed sewage floating in flood waters when the canal went over its banks in a neighboring town in New Jersey.

These are obviously legitimate concerns, and we fail to understand how the Board's opposition to having any construction in the Floodplain shocks the conscience. In fact, on this record, the township's acquies-

4. As noted, the "Township" consists of all of the defendants, viz., the Board of Supervisors and its members, the Zoning Hearing Board and its members, and the Township's Solicitors.

cence to such building would have been shocking. Moreover, even if the Board had formed the opinion that no construction should ever take place on the floodplain, the Board of Supervisors does not make the determination as to whether a variance should be granted. That is the function of the Zoning Hearing Board. Levin does not claim that the ZHB rubber-stamps what the Board has decided.

### (iii). Board's Voting to Oppose Levin's Application.

Levin claims that it shocks the conscience that the Board of Supervisors voted to send the Solicitor to oppose Levin's application without even reviewing it and without having even first read the application. However, given the Board's safety and public health concerns, we believe that the Board members would have been derelict in their duty had they not voted to oppose Levin's application.

Interestingly, we note that the Township submitted an expert report prepared by Gilbert P. High, Jr., who the Township claims is an experienced land use attorney in the Philadelphia area. High opined: (1) that it was obligatory for the Board to review matters brought before the ZHB in order to determine whether the Board should take a position with respect to a particular application; (2) the Board's public safety concerns are reason enough to send the Solicitor to the ZHB hearing; and (3) the Board's action in authorizing the Solicitor to oppose Levin's application was reasonable and for a legitimate government purpose. High concluded by saying that it is the Board's job to look after the public welfare and to challenge those whose development it believes pose a threat to the public safety. Therefore, opined High, the Board acted well within

the proper scope of its legitimate authority. Significantly, Levin offered no expert report, or anything else, to attempt to counter High's expert opinion.

### (iv). Conduct of ZHB Members.

Levin claims that certain conduct of ZHB members shocks the conscience. First, he alleges that during the zoning hearings, *ex parte* communications occurred between ZHB member Gorring, who was appointed by the Board of Supervisors to the ZHB prior to the second zoning hearing, and some of the intervening neighbors. Second, Levin alleges that during the course of the zoning hearing, the ZHB received an *ex parte* memo from Code Enforcement Officer Kuhns, dated February 25, 1998. Levin claims that the memo includes an attached critique of Levin's HEC–II study by Calvin Larson, an engineer who lives in the Township. Levin also claims that the critique of Levin's HEC–II study is set forth in a February 22, 1998, e-mail from Larson to the Township's Environmental Advisory Committee ("EAC") Chairman, Stanley Arabis.[5] Levin alleges that no copy of the critique was given to him or to his attorney. He also claims that it was not until the March 31, 1998 zoning hearing, when ZHB Chairwoman Hirst referred to the critique, that Levin or his attorney became aware of Larson's critique. And, says Levin, it was not until April 19, 1998 that the Township engineer faxed a copy of Larson's critique, which was redacted to omit Larson's name, the February 22, 1998 date of the e-mail and the fact that the e-mail was from Larson to Arabis. Moreover, says Levin, neither Larson nor Arabis testified at any of the hearings and the critique was never entered into the ZHB's record.

**5.** Levin says that Larson testified that Arabis asked that Larson review Levin's application.

However, Levin says that Arabis denied ever making such a request.

However, the evidence of record does not support Levin's allegations. Levin alleged that a man named Washburn was privy to the *ex parte* communications between Gorring and intervening neighbors. However, Washburn testified in his deposition that he did not hear any conversation between Gorring and the intervening landowners, Lamm and Kovacevich. Washburn only testified that he saw, but did not hear, Gorring talk to an intervening landowner named Devlin. Moreover, we cannot help but note that while Levin alleges *ex parte* communications occurred, and suggests that those *ex parte* communications were somehow improper, he never bothers to inform us of the content of the alleged *ex parte* communications.

With regard to the Larson critique, the Township concedes that at some point during the application process, Larson submitted comments to Williams, the Township engineer, about Levin's application. However, Williams testified that he reviewed Larson's comments and forwarded them to Levin's engineer for comment. Levin, while trying to make much of his claim that neither he nor his attorney saw Larson's critique, does not dispute testimony that Williams mailed the critique to Levin's engineer. Moreover, because Larson's comments were forwarded to Levin's engineer, they cannot be *ex parte*. In addition, the Township claims that the ZHB was provided with Larson's e-mail to Arabis and that was stated on the record at the March 31, 1998 hearing. The Township, claims that Levin's lawyer was present, but made no objection. Significantly, Levin fails to mention this rather critical fact.

In addition, the Township says that other evidence, neither mentioned nor rebutted by Levin, shows that the ZHB members acted properly.

- ZHB member Fisher testified at deposition that he had not heard anything

about Levin's application before the first night of the hearings, nor did he talk to any of the Supervisors or the Solicitors before the hearings began. He did not speak to Kuhns before the first night of the hearings and has no knowledge of any ZHB member speaking to the Supervisors or Solicitors before the hearings began. He never spoke to any of the neighbors about the application at anytime other than during the hearings. Similarly, he has no knowledge that any ZHB member spoke to any neighbors.

- ZHB member Hirst testified that she was not aware of any *ex parte* communications concerning Levin's application. She testified that she did not have any discussion with anyone from the Township outside of the hearing room during the hearings. She testified that she was concerned about the safety of rescue personnel having to go to rescue people living in the proposed household.

- ZHB member Gorring testified that once he was appointed, he did not have any discussions with anyone concerning any matter that was pending before the ZHB, including Levin's application.

In sum, Levin's claim that the conduct of the members of the ZHB shocks the conscience has not a shred of record support.

### (v). Delay in Issuing Permits.

Levin contends that the delay in issuing permits demonstrates conscience-shocking conduct on the part of the Township. He recounts the delay as follows. Not unexpectedly, the Township says that none of the alleged "delay" constitutes conscience-shocking conduct. At the outset, the Township claims that Levin's allegations of delay are mere allegations and that he has not produced any evidence to support

them. More importantly, according to the Township, in May 2000, Levin applied only for a foundation permit, although he believed that he paid the fee for both the foundation permit and the building permit because the fees could not be broken apart. The Township admits that the issuance of the foundation permit was stayed pending the appeal process on the advice of the Solicitor. According to the Township, the foundation permit was further delayed because Levin did not submit the necessary documents. However, the Township claims that once Levin submitted the necessary documents, the foundation permit was approved.

In addition, the Township claims that when his counsel requested a building permit in January 2002, Levin was presented with a list of items he must first submit before obtaining the permit. A dispute then arose as to whether Levin had paid the appropriate fee. The Township alleges that Levin claimed that he paid the building permit fee back in 2000 when he applied for the foundation permit, but that Kuhns's cover letter indicates that the fee was only for a foundation permit. The Township claims that Levin produced no evidence contradicting Kuhns's cover letter saying that the fee previously paid was for the foundation permit only. In any event, says the Township, the building permit was issued one week later on February 5, 2002, immediately after Levin paid the building permit fee and the remaining conditions were met.

It is obvious that the parties to this dispute tell completely different stories about the cause of the claimed delay in issuing Levin's permits. However, the dispute does not rise to a genuine issue of material fact because, even accepting Levin's version as true, we do not see any conduct in the permit-issuing process that shocks the conscience. At most, Levin

tells a tale of overbearing conduct by a Township employee. That overbearing conduct is neither so egregious, nor so outrageous, that it shocks the contemporary conscience. We remind Levin that among the "slings and arrows of outrageous fortune," Hamlet included "[t]he insolence of office," and "the law's delay." WILLIAM SHAKESPEARE, HAMLET, act 3, sc. 1.

We also fail to understand how the Open Space Plan and the proposed Canal Setback Ordinance constitute conscience-shocking behavior. Both the Plan and the proposed Ordinance are legitimate areas of governmental concern. Moreover, Levin's Property was never taken for Open Space and the Canal Setback Ordinance was never adopted. Therefore, neither the Open Space Plan nor the proposed Canal Setback Ordinance impinged on any protected property interest Levin has in the Property.

To sum up, there is no conduct by the Township that shocks the conscience. Therefore, Levin was not deprived of any substantive due process right and it is not necessary for us to go to the second step of the qualified immunity inquiry to determine if the alleged right was clearly established at the time of the alleged violation. The district court's grant of summary judgment to the Township on Levin's substantive due process claim was proper.

### B. Abuse of Process.

■ Levin asserted a state-law abuse of process claim against the Township, the Board of Supervisors and the Solicitors. Under Pennsylvania law:

> The tort of abuse of process is defined as the use of legal process against another primarily to accomplish a purpose for which it is not designed. To establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the

plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff. This tort differs from that of wrongful use of civil proceedings in that, in the former, the existence of probable cause to employ the particular process for its intended use is immaterial. The gravamen of abuse of process is the perversion of the particular legal process for a purpose of benefit to the defendant, which is not an authorized goal of the procedure. In support of this claim, [a plaintiff] must show some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.

*Shiner v. Moriarty,* 706 A.2d 1228, 1236 (Pa.Super.1998) (citations, internal quotations and ellipses omitted).

 Levin contends that the legal process abused is the state appeals process. He claims that Board of Supervisors authorized the Solicitors to intervene in his appeal of the ZHB's decision to the Court of Common Pleas, that the Board authorized the Solicitors to appeal the Court of Common Pleas decision to the Commonwealth Court, and that the Board authorized the Solicitors to file a petition for allowance of appeal with the Pennsylvania

Supreme Court, "to accomplish a purpose for which the appeals process was not designed, namely to harass Levin and cause him financial and emotional injury and force him to abandon his attempts to build his home." [6] Levin's Br. at 36. In making that contention, he merely cites to a number of pages in the appendix, but does not begin to tell us what those citations might reveal. Therefore, we question how serious Levin is about his abuse of process claim.

However, if one takes the trouble to read the portions of the record Levin cites to, but does not recite, one quickly concludes that the record clearly shows that the members of the Board of Supervisors were not improperly singling out Levin or using the legal process to harass him. Rather, they simply believed that there were public safety issues involved with new construction in the floodplain and that the zoning ordinance providing that there should not be construction in the flood plain was reasonable. For example, in his deposition Board member Falconi testified:

Q: Okay. Did you consult with Mr. Williams at all before making your vote in favor of seeking review by the Pennsylvania Supreme Court?

A: No.

Q: Is there any reason why?

A: Why I didn't consult with him?

Q: Right.

---

**6.** Levin also says that the alleged delay in issuing the permits constitutes abuse of process. Under Pennsylvania law, "[t]he word 'process' as used in the tort of abuse of process has been interpreted broadly, and encompasses the entire range of procedures incident to the litigation process." *Shiner,* 706 A.2d at 1237. However, the majority of the alleged delay occurred after the state court appeal process had ended. Therefore, the delay cannot, even in the most liberal sense,

be an "incident" to the legal process. More importantly, in *Shiner,* the things that were found "incident" to the legal process were all of the motions and petitions filed, not just a form of coercive legal process such as a subpoena or a writ employed for an improper purpose. Therefore, even the alleged delay that did occur before the state appeals process ended cannot be incident to the litigation. The alleged delay is not legal process.

A: No. I had a belief that our ordinance was reasonable and that the State Supreme Court should determine whether our ordinance was reasonable, which is an ordinance saying that there should be no new residences in the flood plain.

Q: Is that your understanding -

A: I thought that was a reasonable ordinance and that's—I didn't feel any need to do further investigation. It just made sense to me, so, I thing that was the principle that was being tested.

App. at 5583–84. As another example, Board member Welsh testified that he voted to authorize the Solicitor's opposition to Levin's application before the ZHB because of Welsh's concerns about public health issues. When asked whether he relied on the Solicitor's advice in voting to oppose the application, Welsh testified:

I think it was the description of the general conditions of the site as Steve outlined them and the feeling on the part of the supervisors that if we didn't object to this one, you know, we're saying, okay, you can just do it everywhere. You have to be somewhat consistent, I mean, and one of the issues that's involved here is what happens when all of those septic systems flood and these things. I mean, there are major issues that aren't just the level of the site as it sits right there.

App. at 3549.

Given these legitimate concerns, we conclude that Levin's abuse of process claim is without merit and the district court's grant of summary judgment to the Township on that claim was proper.

### C. Civil Conspiracy.

■ Levin alleged a state-law civil conspiracy claim against the Township, the Board of Supervisors, the Zoning Hearing Board and the Solicitors. "In Pennsylvania, to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *General Refractories v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir.2003) (citation and internal quotations omitted). Moreover,

the established rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability. Thus, one cannot sue a group of defendants for conspiring to engage in conduct that would not be actionable against an individual defendant. Instead, actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor.

*In re: Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999) (citations and internal quotations omitted).

We are hard-pressed to understand Levin's civil conspiracy claim. He alludes to the abuse of process claim and the alleged delays in issuing permits, but then shifts to a discussion of the Township's Open Space Plan. Thus, we suppose that he is arguing that there was a conspiracy involving all of the Township defendants to preserve his Property as open space in the Open Space Plan. His argument is as follows:

The abuse of appeals process and permitting process were instituted in a deliberate attempt at all costs by the Township to preserve open space in the Township, specifically to preserve Levin's property as open space. Shortly before Levin purchased his Property and submitted his application for vari-

ance, a $5.9 million bond issue to preserve open space was approved. The Township EAC drafted a plan to preserve Upper Makefield Township's farmland and open space at the same time Levin appeared before the Zoning Hearing Board. The Plan was approved while Levin's application was pending. The Township's Open Space Plan identifies Levin's Property as potentially being part of the Plan. The Open Space Plan also advocates that the Township protect open space within the Township through "non-acquisition based methods." Board Supervisors demonstrated how the Township has used non-acquisition based methods to preserve open space. The Township engaged in a course of action that it thought would "wear-down" Levin to the point that he would be willing to talk with the Township about selling the Property to the Township and/or that he would abandon his attempts to construct his proposed home.

Levin's Br. at 38–39. All of this "evidence," says Levin, presents a genuine issue of material fact and therefore precludes the grant of summary judgment in favor of the Township. However, Levin's argument is pure conjecture.

It is undisputed that the Open Space Plan was not adopted until six months after the Board of Supervisors decided to oppose Levin's request for a variance. Moreover, the Environmental Advisory Committee, which drew-up and developed the Plan, is an advisory counsel to the Board of Supervisors. Its actions are not Township policy unless and until those actions are adopted by the Board of Supervisors. Significantly, Levin has not produced any evidence that the Board decided to adopt the Open Space Plan in an effort to thwart Levin's attempt to build his house divorced from proper consideration of safety. And, Levin has produced no evidence that there is a link between the Board's decision to oppose Levin's variance request and its decision to adopt the Open Space Plan.

Further, the Open Space Plan does not identify Levin's Property as part of the Plan. Certain sections of the Plan do identify "those natural resources deserving of protection," but Levin's Property, consisting of two separate tax parcels, is not identified among those natural resources. Levin claims that the following language from the Plan targets his Property:

> As another outgrowth of the work done on part of the Plan, Upper Makefield Township is reviewing the possibility of undertaking a program to acquire or permanently protect the many tiny lots of land located between River Road and the Delaware River. It is felt that there riparian buffer properties play an important role in maintaining the ecosystem of the riverfront as well as ensuring at lease the visual access to river along the highly traveled river road corridor.

App. at 3107. However, Levin's Property is not referenced by name or tax parcel in this paragraph. Moreover, the Plan talks about pieces of property located between River Road and the Delaware River. Only a portion of Levin's Property is between River Road and the Delaware River. The remainder of the Property is on the other side of River Road and his proposed construction was on that side of River Road. At most, only a portion of Levin's Property may have been subject to the Open Space Plan. The portion on which he wants to build is not.

In addition, the $5.9 million bond issue to preserve open space was the subject of a voter referendum that received voter approval. Therefore, the bond issue can not be used as evidence of a conspiracy among the Township officials given that it

was action taken by a majority of the Township's voters. Finally, Levin's Property was never taken by the Township for open space.

In sum, Levin's allegation that there was a civil conspiracy whose underlying tort was the institution of the Open Space Plan is meritless.

## IV.

Accordingly, when all is said and done, and all the dust has settled this suit appears to be little more than a resident's inability to understand why the Township might not think it prudent land use planning to allow someone to build a home in a flood plain. Accordingly, for all of the above reasons, we will affirm the district court.